**2015-1669**

# United States Court of Appeals
# for the Federal Circuit

LELY PATENT N.V.,

*Appellant,*

*v.*

DELAVAL INTERNATIONAL AB,

*Appellee.*

*Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, Inter Partes Review No. IPR2013-00575, Administrative Patent Judges Toni R. Scheiner, Benjamin D.M. Wood, and Scott E. Kamholz*

## BRIEF OF APPELLANT

MARK L. LORBIECKI
LOWE GRAHAM JONES PLLC
701 Fifth Avenue, Suite 4800
Seattle, Washington 98104
Lorbiecki@LoweGrahamJones.com
Tel: 206.381.3300
Fax: 206.381.3301

*Counsel for Appellant*

FILED: JULY 20, 2015
CORRECTED: JULY 27, 2015

## CERTIFICATE OF INTEREST

Counsel for Patent Owner-Appellant Lely Patent N.V., in compliance with
Fed. R. App. P. 26.1 and Fed. Cir. R. 47.4, certifies the following:

1.    The full name of every party represented by counsel is Lely
      Patent N.V.

2.    Lely Patent N.V. is the real party in interest.

3.    Lely Patent N.V. does not have a parent corporation. No
      publicly held corporation owns more than 10 percent of its
      stock.

4.    The names of all law firms and the partners or associates that
      appeared for the party or amicus now represented by me in the
      trial court or agency or are expected to appear in this court are:

         Mark L. Lorbiecki (WSBA No. 16,796), Member of
                  Lowe Graham Jones PLLC


      Respectfully Submitted:




      _____        __7/20/15___
      Mark L. Lorbiecki                       Date
      LOWE GRAHAM JONES PLLC
      701 Fifth Avenue, Suite 4800
      Seattle, WA 98104
      P: 206.381.3300

i

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................ i

TABLE OF CONTENTS .................................................................. ii

TABLE OF AUTHORITIES ............................................................. iv

TABLE OF ABBREVIATIONS ......................................................... vii

STATEMENT OF RELATED CASES ................................................... 1

STATEMENT OF JURISDICTION ...................................................... 1

I.    STATEMENT OF ISSUES ......................................................... 1

II.   STATEMENT OF THE CASE ...................................................... 2

      A.    Preliminary Statement ............................................... 2

      B.    Nature of the Case, Course of Proceedings, and
            Disposition .............................................................. 3

III.  STATEMENT OF FACTS .......................................................... 4

      A.    The '094 Patent discloses and claims a superior teat
            cleaner that achieves synchronization without connection
            to the workings of a carousel it serves. ....................... 4

      B.    The Amended Claims in this Appeal ............................ 8

      C.    Description of the Two Principal References Relied
            Upon by the PTAB to Render Claim 1 Unpatentable and
            to Deny Lely's Motion to Substitute Claims. ............... 10

            1.    Rose ............................................................ 10

            2.    Chandler .................................................... 12

      D.    The PTAB's Inter Partes Review of the '094 Patent ..... 13

            1.    Proceedings before Institution ...................... 13

            2.    Proceedings after Institution ........................ 14

IV.  SUMMARY OF THE ARGUMENT ........................................................... 15

V.  APPLICABLE LEGAL PRINCIPLES ...................................................... 16

    A.  Standard of Review ................................................................ 16

    B.  Legal Standards as to Application of BRI Standard in light of *Phillips*........................................................................ 17

    C.  Legal Standards Applicable to Motions to Substitute Claims During *Inter Partes* Review........................................ 18

    D.  Legal Standards Relating to Incorporation. ........................... 19

VI.  ARGUMENT ....................................................................................... 20

    A.  The Board legally erred by adopting unreasonably broad construction of "moving past the cleaning station" in Claim 1 of the '094 Patent. ...................................................... 20

    B.  The Board legally erred in finding Claim 1 anticipated by *Rose* in spite of the lack of numerous limitations for which it relies upon two nonincorporating, nonenabling references to *Chandler*. ........................................................ 24

    C.  The Board legally erred in finding Claim 1 as obvious and unpatentable given the limited teaching of *Rose* in view of *Chandler*.................................................................... 29

    D.  The Board legally erred in denying the Patent Holder the right to amend by asserting that the Lely did not address patentability. ........................................................................... 31

CONCLUSION............................................................................................. 36

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

## CASES

*Advanced Display Sys., Inc. v. Kent State Univ.,*
    212 F.3d 1272 (Fed. Cir. 2000) ........................................ 19, 20, 24, 27

*Atmel Corp. v. Info. Storage Devices, Inc.,*
    198 F.3d 1374 (Fed. Cir. 1999) .................................................... 27, 28

*Belkin Int'l, Inc. v. Kappos,*
    696 F.3d 1379 (Fed. Cir. 2012) ........................................................ 16

*Brooks v. Fiske,*
    56 U.S. 212 (1853) ............................................................................ 17

*Cybor Corp. v. FAS Techs., Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998) ........................................................ 18

*Gentry Gallery, Inc. v. The Berkline Corp.,*
    134 F.3d 1473 (Fed. Cir. 1998) ........................................................ 22

*Idle Free Systems, Inc. v. Bergstrom, Inc.,*
    IPR2012-00027, 2013 WL 5947697 (PTAB June 11, 2013) ....... 19, 33

*In re Baxter Intern., Inc.,*
    678 F.3d 1357 (Fed. Cir. 2012) ........................................................ 34

*In re de Seversky,*
    474 F.2d 671 (CCPA 1973) ............................................................... 25

*In re Garner,*
    508 F.3d 1376 (Fed. Cir. 2007) ........................................................ 17

*In re Gleave,*
    560 F.3d 1331 (Fed. Cir. 2009) ........................................................ 17

*In re Kotzab,*
    217 F.3d 1365 (Fed. Cir. 2000) ........................................................ 17

*In re Mettke,*
    570 F.3d 1356 (Fed. Cir. 2009) ........................................................ 16

iv

*In re Morris,*
　　127 F.3d 1048 (Fed. Cir. 1997) .......................................................... 18

*In re NTP, Inc.,*
　　654 F.3d 1279 (Fed. Cir. 2011) .......................................................... 16

*In re Suitco Surface, Inc.,*
　　603 F.3d 1255 (Fed. Cir. 2010) .......................................................... 18

*Interactive Gift Express, Inc. v. Compuserve, Inc.,*
　　256 F.3d 1323 (Fed. Cir. 2001) .......................................................... 35

*Markman v. Westview Instruments, Inc.,*
　　517 U.S. 370, 116 S. Ct. 1384,
　　134 L. Ed. 2d 577 (1996)................................................................... 22

*Microsoft Corp. v. Proxyconn, Inc.,*
　　2015 U.S. App. LEXIS 10081 (Fed. Cir. June 16, 2015) .................. 17

*North Am. Vaccine Inc. v. American Cyanamid Co.,*
　　7 F.3d 1571 (Fed. Cir, 1993) .............................................................. 23

*Phillips v. AWH Corp.,*
　　415 F.3d 1303 (Fed. Cir. 2005) .......................................................... 17

*Stratoflex, Inc. v. Aeroquip Corp.,*
　　713 F.2d 1530 (Fed. Cir. 1983) .......................................................... 35

*Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.,*
　　418 F.3d 1326 (Fed. Cir. 2005) .......................................................... 35

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC,*
　　683 F.3d 1356 (Fed. Cir. 2012) .......................................................... 35

## STATUTES

28 U.S.C. § 1295(a)(4)(A).......................................................................... 1

35 U.S.C. § 103(a) .................................................................................... 16

35 U.S.C. § 141........................................................................................... 1

35 U.S.C. § 141(c) ............................................................................... 1

35 U.S.C. § 316(d) ................................................................. 14, 18, 19

35 U.S.C. § 316(e) ............................................................................. 19

## RULES AND REGULATIONS

37 C.F.R. § 42.100(b) ...................................................................... 17

Federal Circuit Rule 47.5 .................................................................. 1

## OTHER AUTHORITIES

http://nymag.com/news/features/antonin-scalia-2013-10/ ........................... 23

# TABLE OF ABBREVIATIONS

### Parties

| | |
|---|---|
| Lely | Patent Owner-Appellant Lely Patent N.V. |
| DeLaval | Petitioner-Appellee DeLaval International A.B. |

### Terms

| | |
|---|---|
| '094 Patent | U.S. Patent No. 6,443,094 C2 |
| A__ | Joint Appendix at page(s), with (column:lines) for referenced patents |
| AIA | Leahy-Smith America Invents Act |
| Board | Patent Trial and Appeal Board, alternatively "PTAB" |
| BRI | Broadest Reasonable Interpretation |
| *Chandler* | British Patent No. 1,398,596 to Chandler (June 25, 1975) |
| Court | United States Court of Appeals for the Federal Circuit |
| Decision | Final Decision of PTAB in *Inter Partes* Review Proceeding IPR2013-00575 |
| IPR | *Inter Partes* Review |
| *Ornerfors* | WO 97/15183 to Ornerfors (May 1, 1997) |
| Petition | DeLaval's Petition for Inter Partes Review of '094 Patent |
| *Phillips* | US 3,765,373 to Phillips (Oct. 16, 1973) |
| PTAB | Patent Trial and Appeal Board, alternatively "Board" |

PTO                          United States Patent and Trademark Office

*Rose*                       British Patent No. 1,415,318 to Rose (Nov. 26, 1975)


All emphasis in this brief is added unless otherwise indicated.

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Lely provides as follows:

(a) There have been no previous appeals in this proceeding.

(b) It is not aware of any other case that will be directly affected by the Court's decision in this case.

## STATEMENT OF JURISDICTION

This is an appeal pursuant to 35 U.S.C. § 141(c) from the Final Decision of the Patent Trial and Appeal Board of the United States Patent and Trademark Office entered on February 20, 2015 in *Inter Partes* Review No. IPR2013-00575 on U.S. Patent No. 6,443,094.

Lely Patent N.V. timely filed a notice of appeal on April 24, 2015. This Court therefore has jurisdiction over this appeal under 35 U.S.C. § 141 and 28 U.S.C. § 1295(a)(4)(A).

## I.     STATEMENT OF ISSUES

1.     Did the Board legally err by adopting an unreasonably broad construction of "moving past the cleaning station" in Claim 1 of the '094 Patent, and finding Claims 1-11 unpatentable due to that construction?

2.     Did the Board legally err in finding Claim 1 anticipated by *Rose* while *Rose* lacks several of Claim 1's limitations?

3.     Did the Board legally err in finding Claim 1 as obvious and unpatentable in light of the teaching of *Rose* in view of *Chandler*?

1

4.    Did the Board legally err in denying Lely the right to amend by asserting that the Patent Owner did not address patentability, in spite of the arguments of record?

## II.    STATEMENT OF THE CASE

### A. Preliminary Statement

In this appeal, Lely challenges the PTAB's interpretation of Claim 1 as set forth in the Institution Decision (A327-A350) and the Final Decision (A001-A027) that Claims 1-10 are unpatentable as well as the Board's further refusal to enter substitute claims 11-20 of the '094 Patent.

Central to this appeal is that Claim 1 requires continuous rotational movement of a milking carousel while a control section extends a "cleaning section" beneath a cow, sprays the cow's teats and then retracts the cleaning section. The principal references relied upon in the Petition (A028-A088) are a combination of *Rose* (A107-A117) and *Chandler* (A122-A133), which can only work in a discontinuous or "stop/start" rotational motion. Lely has consistently asserted that neither Claim 1, nor substitute Claim 11, read upon the *Rose* reference either alone or in combination with *Chandler.* Both the specification and the plain and ordinary meanings of the terms of Claims 1 and 11, even under the BRI, must be read to require continuous rotation of the

milking carousel and, thus, Claim 1 is neither anticipated nor is it rendered obvious by *Rose* or by a combination of *Rose* and *Chandler*.

## B. Nature of the Case, Course of Proceedings, and Disposition

DeLaval filed a Petition (A028-A088) requesting IPR of Claims 1–10 of the '094 Patent (A089-A106). Lely filed a Preliminary Response (A296-A320). The Board instituted IPR (A327-A350) relative to unpatentability of Claims 1-10, asserting that *Rose* anticipates Claims 1 and 4–9; that *Rose* and *Chandler* render Claims 1 and 4–9 obvious; that *Rose*, *Chandler*, and *Ornerfors* (A134-A158) render Claims 2 and 3 obvious; and that *Rose*, *Chandler*, and *Phillips* (A188-A194) render Claim 10 obvious.

After the Board instituted IPR, Lely filed a Response (A529-A555), as well as a contingent Motion to Amend (A556-A571), seeking to substitute Claims 11–20 for original Claims 1–10. DeLaval filed a Reply (A762-A779), and an Opposition to the Motion to Amend (A780-A798). Lely then filed a Reply in support of its Motion to Amend (A848-A854). In its Decision (A001-A027) the Board found Claims 1 and 4–9 anticipated by *Rose* and rendered obvious by *Rose* and *Chandler*; Claims 2 and 3 obvious by *Rose*, *Chandler*, and *Ornerfors*; and Claim 10 obvious by *Rose*, *Chandler*, and *Phillips*. Further, the Board denied the Motion to Amend. From this ruling, Lely Appeals (A900-A903).

3

### III.    STATEMENT OF FACTS

**A. The '094 Patent discloses and claims a superior teat cleaner that achieves synchronization without connection to the workings of a carousel it serves.**

The only independent claim of the '094 Patent has within its preamble, a limitation the Petition admits is structural in nature (A40), i.e., that of "a milking parlor." The milking parlor includes "a plurality of milking stalls arranged on a moving platform to move through a milking cycle, and said parlor comprises a milk extracting location where milking machines extract milk, and an exit location."

The milking parlor or carousel is portrayed in Figure 1 of the '094 Patent, which, in birds eye view, depicts a plurality of stalls for the arrangement of dairy cows on a carousel milking platform rotating clockwise. Teat washing occurs within the peripheral band having reference number 38, the device being portrayed at reference number 28 (See, generally, A99, 3:46-68). Milking occurs within the



FIG. 1

peripheral band 34, the "claw" having been placed on the teats in the peripheral band 32 and removed in the peripheral band 36. (A "claw," is that part of a milking machine used to draw milk from an udder using low pressure). *See* A98 at 1:14–16, A292 at 3:66–67.

Cows enter on the gang plank that spans to the entry location at 30 and leave the carousel 22 in a chute from the exit location 40 (A99, 3:62). While on the carousel 22, the cows 24 are each contained in the several stalls 42. The stalls 42 locate and confine that cow 24 relative to the carousel 22, thereby allowing automated processes to find the cow 24 and the udders and teats, by repeatable processes, i.e. the teats are always found generally in the same place relative to the stall 42. *See generally*, A292 at 3:3:55-4:14.



FIG. 2

FIG. 4

Moving then, to the cleaning section itself, Figures 2 (A91) and 4 (A93) depict side views of the udder cleaning device 28 in retracted and extended positions. Each stall 42 is defined by two posts 43 at the perimeter of platform 22 (A99 at 4:21–23; A100, 6:35-51). As platform 22 rotates, each vertical post 43 contacts horizontal arm 66 of contact sensor 56 (shown in Figure 3, A92), which indicates that a stall has reached the cleaning location in front of the cleaning apparatus. A99 at 4:23–26, 58–62. Receiving the signal from the sensor 56, a control section causes the arm 46 to move between the cow's hind legs, initiates a spray of disinfectant from nozzle 47 (not depicted but part of dispersion portion 80) onto the udder and then retracts the arm 46. *Id*. at 4:20–31.

6

The principal issues presented to the PTAB have each involved the sole independent claim, Claim 1 of the '094 Patent and thus flow to the dependent claims, 2-10. Claim 1 is reproduced below[1]:

> 1. A system for cleaning udders of cows in a milking parlor, where there is a plurality of milking stalls arranged on a moving platform to move through a milking cycle, and said parlor comprises a milk extracting location where milking machines extract milk, and an exit location, said system comprising:
>
> a) an udder cleaning apparatus positioned at a cleaning location intermediate the milk extracting location and the exit location, with said stalls passing by said cleaning location, said cleaning apparatus comprising:
>
> > i) a mounting structure at the cleaning location;
> >
> > ii) a cleaning section which is movable between a retracted position which is out of a path of travel of the stalls and a cleaning position when the cleaning section discharges cleaning fluid to clean an udder of the cow which is in one of said stalls which is at the cleaning location;
>
> b) a control section comprising a location sensor responsive to location of the stalls and to provide signals identifying arrival times at which each of the stalls is at the cleaning location, said control section being arranged to cause the cleaning section to move, relative to the arrival times, from the retracted position to the cleaning position to discharge said cleaning fluid toward the udder of the cow, then to retract the cleaning section from the cleaning position to complete a cleaning cycle, and when the stall in the cleaning location moves from the cleaning location, to again cause the cleaning section to move to the cleaning position to initiate a subsequent cleaning cycle as a following stall is arriving at the cleaning location.

---

[1] Claim 1 appears as amended in Reexamination No. 90/012,285.

**B. The Amended Claims in this Appeal**

Because the Board initiated the IPR (A358-A361), specifically rejecting the assertions by Lely that the continuous movement is inherent in Claim 1, Lely then moved to amend (A556-A571) the claim to further express the limitation of continuous rotational movement earlier asserted as inherent. Given the very specific amendments, the arguments presented in the Patent Owners Preliminary Response (A296-A320) as to patentability are of record to support the amended claim, Claim 11, and were asserted to be such in the Reply and in Oral Argument. *See Patent Owner's Reply* A850-52; Oral Argument A880-A885. The substitute Claim 11 is presented here:

> 11. (Proposed Conditional Substitute for Challenged Claim 1, in the event that Claim 1 is found not patentable) A system for cleaning udders of cows in a milking parlor, where there is a plurality of milking stalls arranged on a moving platform to move through a milking cycle, and said parlor comprises a milk extracting region where milking machines extract milk, and an exit location, said system comprising:
>
> a) an udder cleaning apparatus positioned at a cleaning location intermediate the milk extracting location and the exit location, with said stalls passing by said cleaning location <u>in continuous motion throughout the milking cycle</u>, said cleaning apparatus comprising:
>
> i) a mounting structure at the cleaning location;
>
> ii) a cleaning section which is movable between a retracted position which is out of a path of travel of the stalls and a cleaning position when the cleaning section discharges cleaning fluid to clean an udder of the cow

which is in one of said stalls which is at the cleaning
location;

b) a control section comprising a location sensor responsive to
location of the stalls and to provide signals identifying arrival
times at which each of the stalls is at the cleaning location,
said control section being arranged to cause the cleaning
section to move, relative to the arrival times, from the
retracted position to the cleaning position to discharge said
cleaning fluid toward the udder of the cow, then to retract the
cleaning section ~~form~~ <u>from</u> the cleaning position to complete
a cleaning cycle, and when the stall in the cleaning location
moves from the cleaning location, to again cause the cleaning
section to move to the cleaning position to initiate a
subsequent cleaning cycle as a following stall is arriving at
the cleaning location.

The mark-up presentation of Claim 11 demonstrates that apart from

correction of a self-evident typographic error ("from" rather than "form"),

the sole purpose of the amendment is to impart an express limitation that the

platform rotates "in continuous motion throughout the milking cycle." No

other amendment of the independent claim was requested and the dependent

claims were amended simply to correct dependencies given the new

numbering of the amended independent claim. Certainly, such an

amendment cannot be viewed as anything but narrowing if the requirement

of continuous motion is not already inherent in the language of the claim.

**C. Description of the Two Principal References Relied Upon by the PTAB to Render Claim 1 Unpatentable and to Deny Lely's Motion to Substitute Claims.**

### 1. Rose

*Rose* (A107-117) describes a mechanical teat washing device that in operation is used with the start/stop carousel described in the second principal reference, *Chandler* (A122-A133). The device is intended to be installed at "one or more locations around the periphery of the rotatable platform" of a "rotary type animal milking and/or treatment apparatus." (A107, 1:27–41).



FIG. 1.

As shown in *Rose* Figure 1, *Rose's* automated spray device comprises swing arm 10 pivotally mounted to rump rail 12 of a rotary type milking apparatus, the milking apparatus including rotatable platform 13 that rotates about a vertical axis relative to rump rail 12. *Id*. at 1:69–75. Piston and cylinder device 15, pivotally mounted to support 14, extends from rump rail 12 and actuates swingable spray arm 23. *Id*. at 1:78–83.

In operation, a cam on rotating platform 13 contacts actuating switch 33, which activates solenoid 31 via timing relay 32. *Id*. at 2:29–32, Fig. 4. Solenoid 31 in turn activates vacuum control valve 17, causing piston and cylinder device 15 to pivot swing arm 10 from a retracted position (indicated in dotted lines) to a cleaning position between the hind legs of the cow standing on platform 13. *Id*. at 2:25–39. Spray nozzles 24 dispense a sanitizing liquid over the cow's udders. *Id*. at 2:42–46. After a period of time determined by timing relay 32, solenoid 31 deenergizes, activating vacuum control valve 17 to cause piston and cylinder device 15 to pivot swing arm 10 back into the inoperative position. *Id*. at 2:49–55.

Within its specification, *Rose* makes two extremely limited references to *Chandler* as an example of a rotary-type milking apparatus suitable for use with *Rose*'s automated spray device, but includes no further explanation as to what structure is necessary to enable its use therewith. *Id*. at 1:75–78; A108, 2:74–77. The parties agree that *Rose*, lacks any of the structure of a plurality of stalls. "*Rose's* figures do not depict stalls arranged on the rotating platform. Neither does *Rose* expressly state that the described cam is provided as a plurality of such cams mounted at locations about the platform relative to each stall." (A47).

### 2. *Chandler*

*Chandler* describes a carousel that carries cows in stalls provided on a platform. The platform stops to admit a cow into one of the stalls. Once the cow is onboard, the operator restarts the platform rotating the carousel to advance the width of one stall in order to admit a next cow.



FIG.1.

As shown in Figure 1, when platform 10 is stationary, stall 12 is presented in line with entry 23, and a cow enters via a ramp. Platform 10 is rotated, carrying the cow to the next station where operator No. 1 washes the cow's udders and applies teat cups 17 manually. As the platform continues to be rotated stall by stall, the cow is automatically milked. Eventually, the cow reaches operator No. 2 (see Fig. 9), who removes the teat cups (A124. at 3:34–37). With each stop of platform 10, another cow enters via entry bridge 23, while another exits via bridge 24 (A124 at 3:29–33). *Chandler* discloses using cam members 57, mounted below each stall 12 on track 26, to engage stop/start switch 55 as platform 10 to assure that rotated from one center of a stall to the next, aligning the relevant stalls for carousel entry and exit (A123, at 2:60–67,

Fig. 4). The operator restarts the carousel once both the entering and the exiting cows have successfully assumed their positions.

### D. The PTAB's *Inter Partes* Review of the '094 Patent

Green Source Automation, initiated two *ex parte* reexaminations of the '094 Patent (Ex Parte Reexamination Nos. 90/011,755 and 90/012,285), which each resulted in issuance of a reexamination certificate. *Id*. The first reexamination resulted in no amendments to the claims. The second reexamination resulted in an amendment to Claim 1, to include the limitation "one of said stalls" (That amendment occurs in the limitation numbered a) ii) the words "a stall" were removed in favor of "one of said stalls" such that the last limitation now reads " a cleaning section which is movable between a retracted position which is out of a path of travel of the stalls and a cleaning position when the cleaning section discharges cleaning fluid to clean an udder of the cow which is in one of said stalls which is at the cleaning location.") (A103).

### 1. Proceedings before Institution

DeLaval's Petition (A028-A088), sought to invalidate the independent Claim 1, and dependent claims 2-10. DeLaval's Petition asserted that Claim 1 was anticipated by the combination of *Rose*, and *Chandler* , or, if *Chandler* is not suitably incorporated into *Rose*, then that Claim 1 is

rendered obvious by the same combination. Claims 2-10 were asserted as obvious in light of, variously, *Ornerfors* (A134-A158), *Hall* (A159-A187), *Phillips* (A195-A213), and *Van der Lely* (A195-A213).

On February 28, 2014, the Board instituted IPR (A327-A350), rejecting Lely's assertion that the *Rose/Chandler* intermittent carousel was not within the scope of Claim 1, which the Board determined to be broad enough, in the BRI, to include the intermittent revolution taught by the *Rose/Chandler* combination. To institute the proceeding, the Board specifically held that "nothing in the plain language of element (a) of claim 1 requires that the platform must move continuously. Thus, the plain language would appear to be satisfied whether the platform moves continuously or intermittently past the cleaning location" thereby rejecting Lely's assertion that the Claim 1 was patentable because it required continuous movement of the carousel (A334).

### 2. Proceedings after Institution

#### a. Lely's Motion to Amend Claims

After institution (A327-A350), pursuant to 35 U.S.C. § 316(d), Lely moved to amend Claims 1-10 of the '094 Patent, conditionally substituting therefor Claims 11 through 20, respectively (A556-71). Significantly, only Claim 1 was changed to include a narrowing limitation, Claims 2-10 were

14

merely amended to fix dependencies between the original and substituted claims.

### b. Final Decision

The PTAB issued it's decision on February 20, 2015 (A001-A027), which addressed, *inter alia*, Lely's motion to enter amended claims 11-20. The PTAB found that Lely "fail[ed] to demonstrate that the substitute claims [1-10] are patentable over the prior art of record [*Rose* and *Chandler*]" (A26). "Patent Owner's failure to address the art of record is fatal to its motion, as the patentability of substitute claim 11 over *Rose* and *Chandler* is far from self-evident." *Id*. The Board specifically determined, "that Petitioner has shown by a preponderance of the evidence that claim 1 is unpatentable under 35 U.S.C. § 102(b) as anticipated by *Rose*." (A14).

### IV.    SUMMARY OF THE ARGUMENT

The specification of the '094 Patent requires continuous rotation of the carousel in at least three distinct places, one of which is in the "Background of the Invention" and not demarcated as limited to any one embodiment. Additionally, the claim's plain language must include, even under BRI, the limitation requiring continuous rotational movement of the carousel milking parlor. *Rose* requires motion be interrupted to admit and release cows from the *Chandler* carousel and cannot anticipate Claim 1, nor the claims that depend from it. The proposed amendment of Claim 1 to

express the limitation of requiring continuous movement was shown to be patentable, and ought to have been allowed.

The parties and the Board agree that the limitation in the preamble is structural which requires "a plurality of milking stalls arranged on a moving platform to move through a milking cycle" and that *Rose* does not supply such a limitation. *Rose* cannot anticipate Claim 1.

Because of the intermittent motion and operator intervention required to operate the combination of *Rose* and *Chandler*, they cannot be said to render either Claim 1 nor Claim 11, nor the claims that depend from them as obvious.

## V.    APPLICABLE LEGAL PRINCIPLES

### A. Standard of Review

The Board's legal conclusions and statutory interpretation are reviewed *de novo*. *Belkin Int'l, Inc. v. Kappos*, 696 F.3d 1379, 1381 (Fed. Cir. 2012).

Anticipation and prior art teachings present questions of fact. *In re NTP, Inc.*, 654 F.3d 1279, 1297 (Fed. Cir. 2011). The determination of obviousness under 35 U.S.C. § 103(a) is a legal conclusion based on underlying findings of fact. *In re Mettke*, 570 F.3d 1356, 1358 (Fed. Cir.

2009). The Board's ultimate determination of obviousness is reviewed *de novo*. *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000). This Court reviews the Board's factual findings for substantial evidence. *In re Gleave*, 560 F.3d 1331, 1335 (Fed. Cir. 2009).

This Court does not defer to the Board's interpretation of Patent Office regulation, when it is plainly erroneous or inconsistent with the regulation. *In re Garner*, 508 F.3d 1376, 1378-79 (Fed. Cir. 2007).

## B. Legal Standards as to Application of BRI Standard in light of *Phillips*.

Claim construction in IPR must be reasonable in light of the specification. 37 C.F.R. § 42.100(b). Even when exploiting the BRI, the Board is constrained by the teachings of the specification: "The claim, or summing up, however, is not to be taken alone, but in connection with the specification and drawings; the whole instrument is to be construed together." *Brooks v. Fiske*, 56 U.S. 212, 215 (1853); *accord Phillips v. AWH Corp*., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*). To quote this Court in *Microsoft Corp. v. Proxyconn, Inc*., 2015 U.S. App. LEXIS 10081, 6-7 (Fed. Cir. June 16, 2015):

> The Board may not construe claims during IPR so broadly that its constructions are unreasonable under general claim construction principles. "The protocol of giving claims their

broadest reasonable interpretation . . . does not include giving claims a legally incorrect interpretation." Rather, "claims should always be read in light of the specification and teachings in the underlying patent." The PTO should also consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review. Even under the broadest reasonable interpretation, the Board's construction "cannot be divorced from the specification and the record evidence" and "must be consistent with the one that those skilled in the art would reach," A construction that is "unreasonably broad" and which does not "reasonably reflect the plain language and disclosure" will not pass muster. [Citations omitted.]

The Court reviews the PTO's interpretation of disputed claim language to determine whether it is "reasonable." *In re Morris*, 127 F.3d 1048, 1055 (Fed. Cir. 1997). The Court has held that the BRI standard does not give the PTO (or, by extension in the present case, the PTAB) "an unfettered license to interpret claims to embrace anything remotely related to the claimed invention." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). This court reviews claim construction without deference. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455-56 (Fed. Cir. 1998) (*en banc*).

## C. **Legal Standards Applicable to Motions to Substitute Claims During** *Inter Partes* **Review**

In an IPR, 35 U.S.C. § 316(d)(1) gives Lely the right in to request amendment of the challenged claims. The only restriction on this right is that "[a]n amendment under this subsection may not enlarge the scope of the

claims of the patent or introduce new matter." 35 U.S.C. § 316(d)(3). The same section of the statute makes clear that, "[i]n an inter partes review . . . , the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence." 35 U.S.C. § 316(e). Notably, this burden of proof is irrespective of the type of claim that is being challenged (i.e., original or amended); the statute places the burden of proving any "proposition of unpatentability" squarely on the petitioner. *Id.*

A showing of patentable distinction can rely on declaration testimony of a technical expert about the significance and usefulness of the feature(s) added by the proposed substitute claim, from the perspective of one with ordinary skill in the art, and also on the level of ordinary skill, in terms of ordinary creativity and the basic skill set. *Idle Free Systems, Inc. v. Bergstrom, Inc., IPR2012-00027, 2013 WL 5947697 (PTAB June 11, 2013)* at *4–5. The Idle Free decision has been designated as "informative."

**D. Legal Standards Relating to Incorporation.**

A patent claim is invalid as anticipated if "the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). Other

material may be considered as part of the single document if the host

document incorporates it by reference. *Id.*

A host document incorporates material by reference if it "identif[ies]

with detailed particularity what specific material it incorporates and clearly

indicate[s] where that material is found in the various documents." *Id.*

Whether the host document describes the material with sufficient

particularity is determined from the point of view of a person of reasonable

skill in the art. *Id.* at 1283. Anticipation is a question of fact, while

incorporation by reference, and therefore "what material . . . constitutes the

single reference" for anticipation purposes, is a question of law. *Advanced

Display Sys.*, 212 F.3d at 1283.

## VI.   ARGUMENT

### A. The Board legally erred by adopting unreasonably broad construction of "moving past the cleaning station" in Claim 1 of the '094 Patent.

From the plain and ordinary meaning of its claim terms, Lely, has

consistently maintained that the original independent claim, Claim 1,

includes a limitation that the carousel be in continuous motion. The

preamble requires, as a condition precedent, the "milking stalls be arranged

on a moving [rather than movable] platform" enabling "the stalls to move

through a milking cycle." In limitation a), the "stalls are "passing by said

cleaning location." In limitation b), the location sensor is "to provide signals identifying arrival times at which each of the stalls is at the cleaning location" and that the same limitation uses the arrival time "to retract the cleaning section from the cleaning position to complete a cleaning cycle. It is when "the stall in the cleaning location moves from the cleaning location, to again cause the cleaning section to move to the cleaning position to initiate a subsequent cleaning cycle as a following stall is arriving at the cleaning location." This plain language is clear, continuous movement of the carousel is the trigger for events that are claimed as limitations. The specification recurrently supports such a reading:

> The system is to be implemented in a circular milking parlor that basically consists of a circular platform about 40-100 ft. in diameter that concentrically rotates about its center. The circular platform has 20-100 slots (i.e. stalls) around the perimeter where cows stand while being milked. A291, 1:26-32; *see also* A292 at Col.3:50-55.

> The platform 22 rotates continuously, but the rotation is relatively slow and the cows can step off the rotating platform 22 without much difficulty. A292 at 4:11-14.

> [T]he milking operation is essentially a continuous one, meaning the rotating platform 22 constantly rotates and the cows 24 continuously enter onto and exit from the rotating platform 22. A293 at 6:16-18.

> The stalls 42 on the rotating carousel 22, move continuously past the cleaning location moving to the left "at a relatively slow speed of 0.2 to 0.9 mph." A293 at 6:31-34.

Each of these apart or, more appropriately read as a whole, militate for a finding that any reasonable construction of the claim includes a continuously rotating carousel. In any normal conversational context an auditor, when asked if "moving" required an object to be in motion, would reply, quite naturally, "yes, why?" If the structural and limiting preamble to the claim requires the presence of "a milking parlor, where there is a plurality of milking stalls arranged on a moving platform to move through a milking cycle," the plain and ordinary meaning of the words would require movement through the whole of the milking cycle. It is, in fact, a crabbed and constrained reading that would stretch a nose of wax to cover even intermittent motion, for when the carousel is not moving, the preamble is not satisfied. And there is no dispute that the preamble is limiting.

In *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996), the Supreme Court held that "a term can be defined only in a way that comports with the instrument as a whole," and that the task of claim construction demands preservation of "the patent's internal coherence." *Markman*, 517 U.S. at 389, 390. Furthermore, claims cannot be construed any "broader than the supporting disclosure." *The Gentry Gallery, Inc. v. The Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998). Indeed, in a given case, the scope of the right to exclude may be

limited by a narrow disclosure." Id. at 1479. A patentee cannot "disclose and claim an invention narrowly and then, in the course of an infringement suit, argue effectively that the claims should be construed to cover that which is neither described nor enabled in the patent." *North Am. Vaccine Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir, 1993). Similarly, the Board is not at liberty to torture the construction of the claims beyond the reasonable interpretation of those terms. There is no assertion of intermittent motion in the specification of the '094 Patent and every assertion of motion describes it as continuous.

Intermittent motion is not a species of motion; it is intervals of motion bracketed by intervals of non-motion or of stationary repose. There is no real justification for a finding that when in repose, the carousel is in motion as the preamble, the limitations, and the specification require. Neither the Board nor DeLaval have pointed to a single utterance by the inventor, DeWaard, admitting to configuration for a noncontinuous rotating carousel. To quote the regular recurrent theme of Justice Scalia, "words have meaning, and their meaning does not change."[2]

---

[2] E.g., http://nymag.com/news/features/antonin-scalia-2013-10/

The Board's interpretation that continuous movement is not required as a limitation of Claim 1 is in error.

## B. The Board legally erred in finding Claim 1 anticipated by *Rose* in spite of the lack of numerous limitations for which it relies upon two nonincorporating, nonenabling references to *Chandler*.

DeLaval admits that *Rose* does not contain a milking parlor nor the mechanical or electronic connections to define how *Rose* will be used with a *Chandler* milking parlor. Any description of those elements relies on one skilled in the art, taking the matter out of the realm of anticipation:

> *Rose's* figures do not depict stalls arranged on the rotating platform. Neither does *Rose* expressly state that the described cam is provided as a plurality of such cams mounted at locations about the platform relative to each stall. However, these features are implicitly found in *Rose*. One skilled in the art would understand *Rose's* apparatus as implicitly including platform-mounted stalls as would have been required for *Rose's* disclosed purpose of securing and orienting plural cows on the rotating platform. Likewise, the skilled artisan would have understood *Rose* as implicitly disclosing the described cam as being provided in relation to each cow on the platform. A47.

Anticipation is a question of fact, while incorporation by reference, and therefore "what material .. . constitutes the single reference" for anticipation purposes, is a question of law. *Advanced Display Sys.*, 212 F.3d at 1283. To incorporate matter by reference, a host document must contain language "clearly identifying the subject matter which is incorporated and where it is to be found"; a "mere reference to another application, or patent,

or publication is not an incorporation of anything therein. . . ." *In re de Seversky*, 474 F.2d 671, 674 (CCPA 1973). Put differently, "the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents." *Adv. Display Sys.*, 212 F.3d at 1282. Nowhere does the incorporation include the connections necessary to effect the working whole but rather relies on one skilled in the art to supply them implicitly. Such is too scant a disclosure onto which to hang an anticipation finding.

The exact language of the words purporting to incorporate *Chandler* into *Rose* are instructive. At A107, 1:75-78, *Rose* states: "Such a rotary type milking apparatus forms the subject of our United Kingdom Patent Specification Number 1,398,596." At A108, 2:74-77, *Rose* states "Such a rotary type milking apparatus is again of the type described in our United Kingdom Patent Specification Number 1,398,596." And that is the whole of the apparent attempt to incorporate. If that reference was alone enough of a designation, then in his statement, one would expect DeLaval's expert, Mr. Jonathan Cagan to assert more than that the references are combinable but how they are combinable and what was necessary to do so. Yet, when asked at A700, the dialogue went thus:

A.    The Rose patent does not explicitly state without incorporation of Chandler the plurality of milking stalls. It does state that it is a rotary type milking apparatus in which the cows are carried on a rotatable platform which, at least the prior art I've seen, generally has a plurality of stalls.

Q.    And, in fact, that's explicitly shown in Figure 1 of the Chandler '596 patent, isn't it?

A.    Yes.

Q.    So you really have to put these two things together to arrive at the claim limitations, is that correct?

A.    Well, in terms of the figures, you're correct; however, again, it talks about, in Rose, it is known to milk cows on a rotary type milking apparatus in which the cows are carried on a rotatable platform and are automatically milked, et cetera, and, again, a rotatable milking apparatus, at least the ones that I have seen, all have stalls which I believe is implicit in that statement.

[Objection omitted.]

And further at A702:

A. Well, I'll look at Chandler in a moment, which it is perhaps there, but first I want to just see if it references something here.
(Witness reviews document.)
Okay.  So I don't see it otherwise disclosed -- well, it's disclosed in Rose through Chandler, and with Chandler, we're looking for the milk extracting location.

The expert continues through A715 with no clear indication where the combination of *Rose* and *Chandler* would require the placement of the teat washing device; wherein the claim is explicit—it is located intermediate of the milking location and the exit location. Accepting that Mr. Cagan is a person having ordinary skill in the art, the configuration of the *Rose* device

should have come readily to hand if it was, in fact, obvious. Any other explanation as to how to place the teat washer with certainty admits to hindsight reasoning.

DeLaval and the Board confuse the role of one skilled in the art in anticipation analysis rather than that relative to obviousness. In making that determination whether a reference to an outside document successfully incorporates the disclosed structure, "the standard of one reasonably skilled in the art should be used to determine whether the host document describes the material to be incorporated by reference with sufficient particularity." *Advanced Display*, 212 F.3d at 1282. The court's role is to determine what material in addition to the host document constitutes the single reference. The factfinder's role, in turn, is to determine whether that single reference describes the claimed invention." *Id*. Here, when specifically asked, Mr. Cagan could not locate the teat washer intermediate to the milking location and the exit location. The limitation was not present in the combination in the eyes of one skilled in the art.

In *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1381 (Fed. Cir. 1999), this court refused to utilize the concept of incorporation by reference to include a structure in the prior art as a corresponding structure

for a means-plus-function claim element. In *Atmel*, this court held that the title of a prior art reference could provide the structure for a mean-plus-function element because "Atmel's expert, Callahan, testified that this title alone was sufficient to indicate to one skilled in the art the precise structure of the means recited in the specification." *Id*. at 1382. His testimony was essentially unrebutted. *Id*. If, on the other hand, the title did not disclose the prior art structure, the structures in the prior art reference could not be a corresponding structure to the means-plus-function claim element. *Id*. (holding that "the district court properly held that the Dickson article [prior art cited in the patent] may not take the place of structure that does not appear in the specification").

Under cross-examination, DeLaval's own expert admitted that he could not determine what portion of *Chandler* that *Rose* had incorporated:

> As I stated earlier, my belief -- well, I believe my opinion is that Rose anticipates the '094 Patent because it does incorporate Chandler, the '596; however, if it's deemed that that is not the case, then I'm looking at each of them separately and saying that it's still -- I'm sorry, forget the word separately. I'm looking at them now as two references which together make obvious the patent claim. A727-728.

*Rose* does not incorporate *Chandler* to the extent necessary to supply the structure of stalls on the carousel or to locate the teat washing device thereon and therefore the finding of anticipation is in error. To find

otherwise is inconsistent with the Board's own determination that the

preamble of Claim 1 is, in law, limiting.

### C. The Board legally erred in finding Claim 1 as obvious and unpatentable given the limited teaching of *Rose* in view of *Chandler*.

It is important to note what the Board did and did not find. When

faced with the specific question of whether *Rose* did teach a continuous

motion device, the Board declined to rule. This is apparent in the language

the Board selects to make its findings, at A020:

> Patent Owner also argues that the combination of *Rose* and *Chandler* does not teach all of claims 1's limitations, because the combination does not teach that the plurality of milking stalls must be in continuous motion as they pass by the cleaning location. See PO Resp. 18 (asserting that "Dr. Cagan's conclusion of obviousness cannot be upheld" because Dr. Mein concludes that the combination of Rose and Chandler "could only work in the context of an intermittent carousel"). But we determined above that claim 1 does not require the milking stalls to move continuously past the cleaning location. Therefore, this argument is unpersuasive.

As stated relative to the argument about application of BRI to Claim

1, there are several indicia of limitation that require the carousel rotate in

continuous motion in the plain and ordinary meaning of the language. Lely

has consistently maintained that the original independent claim, Claim 1, has

in it a limitation that the carousel is in continuous motion. Lely asserts that

the preamble requires, as a condition precedent, the "milking stalls be

arranged on a moving [rather than movable] platform" enabling "the stalls to move through a milking cycle;" that the "stalls are "passing by said cleaning location;" that the location sensor is "to provide signals identifying arrival times at which each of the stalls is at the cleaning location" and that "to retract the cleaning section from the cleaning position to complete a cleaning cycle, and when the stall in the cleaning location moves from the cleaning location, to again cause the cleaning section to move to the cleaning position to initiate a subsequent cleaning cycle as a following stall is arriving at the cleaning location" all militate for a finding that any reasonable construction of the claim includes a continuously rotating carousel. The Board simply found that these are not sufficient to find rotation in continuous motion throughout the milking cycle a limitation that existed in the claim. The Board did not find that *Rose* nor that *Rose* in combination with *Chandler* taught a teat washer that could operate with a carousel in continuous rotational motion.

In fact, the Board admits that *Rose* does not teach such operation at Decision, A026:

> Neither Patent Owner nor its expert contend that it would have been beyond ordinary skill at the time of the invention to modify *Rose's* automated spray device so that it could be used on a milking apparatus with a continuously rotating platform.

The issue again revolves about the question of motion of the carousel. The Board erred in finding that the combination of *Rose* and *Chandler* rendered Claim 1 obvious.

### D. The Board legally erred in denying the Patent Holder the right to amend by asserting that the Lely did not address patentability.

The Board determined that Lely's failure to address the art of record is fatal to its motion (A026). That conclusion is plainly in error because it ignores the fact that both through the expert, Dr. Graham Mein, and in adopting the Preliminary Statement (A296-A320), Lely did address patentability over the art of record. The whole of Lely's Preliminary Statement addresses how Claims 1-10 with the proposed limitation where allowable over the art of record. Lely relied upon its Preliminary Response which argued forcefully that Claim 1 was patentable as its requirement of continuous rotation distinguished the claimed matter from the *Rose/Chandler* combination. The reliance was twice expressed. *See Patent Owner's Reply* A850-52; Oral Argument A880-A885. Lely also provided the analysis of Dr. Mein in support of the patentability of the Amended Claims in light of the *Rose/Chandler* combination (A615-A627). Specifically, at A622-23:

Rose enabled the automation of pre- and postmilking teat spraying. Two spray devices were provided for this (see page 2, line 58 and further): one only for water near the position of operator 1 in *Chandler* (figure 9) and one for water and sanitation liquid somewhere near the position of operator 2 in *Chandler*. The *Rose* system relied entirely on the fact that, in the *Chandler* rotary parlor, there was ample time during the rest phases to perform a number of actions (for example, see *Rose* page 2, lines 16-57). A cam on the rotatable platform (see page 2, lines 23 and 30) actuated a number of operations. It would appear to be implicit that these cams were equivalent to the *Chandler* cam members 57 that caused the rotation to stop. Then the timing relay 32 in *Rose* ensured the proper sequence of actions in the 20-sec Chandler platform rest phase. From these descriptions, it seems quite clear that the *Rose* invention was completely reliant on the *Chandler* platform being stationary for relatively long (20-sec), repeatable and predictable periods to perform its automatic teat spraying function. In summary, *Rose* and *Chandler* are specifically limited to include a rest step when the platform is not rotating[, to load and unload cows].

There is no rule that requires a specific format for showing that the substitute claims are patentable in light of the proposed amendments. PTAB precedent only states that the substitute claims must be shown so to be patentable. Lely fulfilled that requirement.

Further, it is clear that no showing would have been sufficient. The Board sought proof that not only was there no known art that would , in combination with Rose, render Claim 11 obvious, but, further, that no mechanic could in any way modify Rose to conform to the limitations of Claim 11. The Board place the burden upon Lely to disprove any possible

configuration of a teat washer that might meet the limitations of Claim 11, including Lely's own:

> Neither Patent Owner nor its expert contend that it would have been beyond ordinary skill at the time of the invention to modify *Rose's* automated spray device so that it could be used on a milking apparatus with a continuously rotating platform. A026.

> While admitting that Lely has argued and submitted evidence in support of that argument that the substitute claims would be patentable over the art of record (i.e. *Rose* and *Chandler*) the Board simply pronounced, that Lely had not argued for the patentability over the art of record, ignoring both the Declaration of Dr. Graham Mein (A609-A645) and the forceful arguments of patentability submitted as the Patent Owner's Preliminary Statement (A296-A320), Lely's description of the amendment (A877-A885; A896-A898); and Patent Owner's Reply to Opposition to Motion to Amend. (A849-A851) all address the patentability of Claim 11 over the art of record.

In *Idle Free*, the Board detailed the burden of the Patent Owner to show entitlement to amend its claims. *Idle Free Systems v. Bergstrom, Inc.*, IPR2012 00027, Paper 26, (June 11, 2013). Specifically, the Board indicated that a Patent Owner is required to present a complete listing of substitute claims (showing markups over the issued claims), provide citations to the original disclosure and earlier-filed disclosures for each claim that is added

33

or amended, offer claim constructions for new claim terms, show

patentability over the prior art of record, show patentability over all prior art

known to the Patent Owner, and further make some representation "about

the specific technical disclosure of the closest prior art." *Id*. at p. 7. The

Board further demands supporting expert testimony, because mere

statements by counsel are "inadequate." *Id*. at p.7-8.

Along with this heighted burden, the Patent Owner is afforded a mere

15 pages, in 14 pt. font, double-spaced, to demonstrate its entitlement to the

substitute claims. While a motion for additional pages can be made, as of the

filing of this paper, Lely is not aware that the Board has granted any motion

seeking additional pages. In view of the above, it is clear that amendments to

the claims are a practical impossibility during IPR. Why is it, then, unusual

or impermissible, that a movant would look to prior argument to supply

arguments already available to the Board in a succinct and familiar form? To

require them to be restated into the record is to glorify form over substance.

It is appropriate to rely on the record generated especially in light of

these procedurally compact proceedings. The unwillingness to repeat what

has been fully set out in a prior pleading is not a waiver. This Court, in *In re*

*Baxter Intern., Inc*., 678 F.3d 1357, 1362 (Fed. Cir. 2012), promulgated the

doctrine that no waiver exists when the appellant raised timely arguments regarding the examiner's analysis of a limitation. In *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1360-61 n.3 (Fed. Cir. 2012) for the proposition that presenting the "essence of its present arguments" to the Board is sufficient to preserve the issue. In *Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.*, 418 F.3d 1326, 1338 n.1 (Fed. Cir. 2005), this Court stated that it is sufficient to raise the general legal issue below; "this court does not review supporting arguments, but only the decisions reached by the trial court." *Interactive Gift Express, Inc. v. Compuserve*, Inc., 256 F.3d 1323, 1346 (Fed. Cir. 2001) (citing *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed. Cir. 1983)).

The Board acknowledged Dr. Mein's statement in its Decision. In Oral Argument, Lely specifically referred to the earlier statement as to patentability (A880-A885). To deny the right to amendment where sufficient information has been provided, according to the Board's own precedent makes the right of amendment illusory (A876-A877). Lely ought to have been granted its motion to amend.

## CONCLUSION

For all the reasons given, Lely respectfully requests that: (1) the erroneous construction of "moving past the cleaning station" be corrected, applying the claim construction principles of *Phillips* or at least restricting the construction to the broadest reasonable construction, thereby requiring the reversal of the determination that *Rose* anticipates Claims 1, 4-9, and 23 and in combination with *Chandler* renders Claims 1-10 obvious. (2) In the event that the grounds for unpatentability are not reversed, that the additional requirements in excess of Patent Office regulations *sua sponte* imposed by the Board be rejected, requiring reversal of the decision not to grant Lely's Motion to Amend.

Respectfully submitted this 20th day of July, 2015.

LOWE GRAHAM JONES PLLC

Mark L. Lorbiecki, WSBA No. 16796
LOWE GRAHAM JONES PLLC
701 Fifth Avenue, Suite 4800
Seattle, WA 98104
Telephone: 206.381.3300
Facsimile: 206.381.3301
lorbiecki@lowegrahamjones.com

Attorneys for Appellant

36

# **ADDENDUM**

Trials@uspto.gov                                           Paper 42
Tel: 571-272-7822                          Entered:  February 20, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

DELAVAL INTERNATIONAL AB,
Petitioner,

v.

LELY PATENT N.V.,
Patent Owner.

_____

Case IPR2013-00575
Patent 6,443,094 C2

_____

Before TONI R. SCHEINER, BENJAMIN D. M. WOOD, and
SCOTT E. KAMHOLZ, *Administrative Patent Judges.*

WOOD, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00575
Patent 6,443,094 C2

# I.    INTRODUCTION

## A.    Background

Petitioner DeLaval International AB ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–10 of U.S. Patent No. 6,443,094 C2 (Ex. 1001, "the '094 patent").  Lely Patent N.V. ("Patent Owner") filed a Preliminary Response (Paper 11, "Prelim. Resp."). We instituted an *inter partes* review on the following grounds of unpatentability:[1]

| Reference[s] | Basis | Claims Challenged |
|---|---|---|
| Rose[2] | § 102(b) | 1 and 4–9 |
| Rose and Chandler[3] | § 103(a) | 1 and 4–9 |
| Rose, Chandler, and Ornerfors[4] | § 103(a) | 2 and 3 |
| Rose, Chandler, and Phillips[5] | § 103(a) | 10 |

After the Board instituted trial, Patent Owner filed a Patent Owner Response (Paper 26, "PO Resp."), as well as a contingent Motion to Amend seeking to substitute claims 11–20 for original claims 1–10.  Paper 27 ("Mot. to Amend").  Petitioner filed a Reply to Patent Owner's Response (Paper 31, "Pet. Reply"), and an Opposition to the Motion to Amend (Paper 32, "Opp. to Mot. to Amend").  Patent Owner then filed a Reply in support of its Motion to Amend.  Paper 34 ("Reply to Opp. to Mot. to Amend").

---

[1] Decision to Institute (Paper 13, "Dec.") 23.

[2] British Patent No. 1,415,318 to Rose (Nov. 26, 1975) (Ex. 1002).

[3] British Patent No. 1,398,596 to Chandler (June 25, 1975) (Ex. 1004).

[4] WO 97/15183 to Ornerfors (May 1, 1997) (Ex. 1005).

[5] US 3,765,373 to Phillips (Oct. 16, 1973) (Ex. 1007).

IPR2013-00575
Patent 6,443,094 C2

Oral Hearing was held on September 12, 2014, and the Hearing Transcript (Paper 41, "Tr.") has been entered in the record.

We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a). We determine that Petitioner has shown by a preponderance of the evidence that the challenged claims are unpatentable. We deny Patent Owner's Motion to Amend.

B.    *Related Proceedings*

The '094 patent has been asserted in an infringement action titled *Daritech, Inc. v. Green Source Automation, LLC*, Case No. 1:11-cv-156 (C.D. Cal. Jan. 27, 2011). Pet. 54. Daritech is Patent Owner's predecessor-in-interest. Paper 10, 1. Patent Owner informs us that this matter has been resolved. *Id.* The defendant in that proceeding, Green Source Automation, initiated two *ex parte* reexaminations of the '094 patent (Appl. Nos. 90/011,755 and 90/012,285), which also have been resolved. *Id.* The first reexamination resulted in no amendments to the claims. Ex. 1001, '094 C1. The second reexamination resulted in amendments to claim 1. *Id.* at '094 C2. Finally, Petitioner informs us that Patent Owner filed U.S. Appl. No. 14/476,979 seeking reissue of the '094 patent. Paper 40, 1.

IPR2013-00575
Patent 6,443,094 C2

C.    *The '094 Patent*

The '094 patent relates to an apparatus for automatically sanitizing the udder of a cow, after it has been milked. Ex. 1001, Abstract. The system is implemented on a circular, rotating milking parlor. *Id*. at 1:26–27, Fig. 1. Figure 1 of the '094 patent is reproduced below:



Figure 1 depicts "conventional" milking parlor 20 on which the automatic cleaning device 28 is installed. *Id*. at 3:47. Milking parlor 20 comprises platform 22, which continuously rotates at a relatively low speed so that cows can step onto and off of the platform with little difficulty; perimeter railing 26 surrounding the platform; and inwardly facing stalls 42, which hold cows 24. *Id*. at 3:47–55. As platform 22 rotates, the stalls pass by six locations where portions of the milking operation occur. *Id*. at 3:56–59. Each cow 24 enters at entry location 30, where a milking operator washes its udder before milking. *Id*. at 3:62–66. A "claw," used to draw

4

IPR2013-00575
Patent 6,443,094 C2

milk from an udder using low pressure, is attached to the cow's udder at
location 32. *Id*. at 1:14–16, 3:66–67. Milk is extracted at milking location
34, and a spring-loaded device withdraws the claw at removal location 36.
*Id*. at 4:2–7. At udder cleaning location 38, cleaning device 28 sprays the
cow's udder with disinfectant. *Id*. at 4:7–10. The cow backs out of stall 42
at exit location 40. *Id*. at 4:10–11.

Figures 2 and 4 of the '094 patent are reproduced below:



Figures 2 and 4 depict in greater detail udder cleaning device 28.
Each stall 42 is defined by two posts 43 at the perimeter of platform 22. *Id*.
at 4:21–23.[6] As platform 22 rotates, each vertical post 43 contacts
horizontal arm 66 of contact sensor 56 (shown in figure 3), which indicates
that a stall has reached the cleaning location in front of the cleaning
apparatus. *Id*. at 4:23–26, 58–62. An optical sensor 58 detects whether a

---

[6] Although Figure 2 uses reference number 43 to refer to the posts, the
written description refers to "posts 44." Ex. 1001, 4:21. We will conform to
Figure 2's reference number.

cow is occupying stall 42, and if so, arm 46 moves between the cow's hind legs, sprays the udder with disinfectant from nozzle 47 (not depicted but part of dispersion portion 80), and then retracts. *Id*. at 4:20–31.

### D.    Illustrative Claims

Sole independent claim 1 of the '094 patent is reproduced below:[7]

1.    A system for cleaning udders of cows in a milking parlor, where there is a plurality of milking stalls arranged on a moving platform to move through a milking cycle, and said parlor comprises a milk extracting location where milking machines extract milk, and an exit location, said system comprising:

a) an udder cleaning apparatus positioned at a cleaning location intermediate the milk extracting location and the exit location, with said stalls passing by said cleaning location, said cleaning apparatus comprising:

i) a mounting structure at the cleaning location;

ii) a cleaning section which is movable between a retracted position which is out of a path of travel of the stalls and a cleaning position when the cleaning section discharges cleaning fluid to clean an udder of the cow which is in one of said stalls which is at the cleaning location;

b) a control section comprising a location sensor responsive to location of the stalls and to provide signals identifying arrival times at which each of the stalls is at the cleaning location, said control section being arranged to cause the cleaning section to move, relative to the arrival times, from the retracted position to the cleaning position to discharge said cleaning fluid toward the udder of the cow, then to retract the cleaning section from the cleaning position to complete a cleaning cycle, and when the stall in the cleaning location moves from the cleaning location, to again

---

[7] Claim 1 appears as amended in Reexamination No. 90/012,285. *See* Ex. 1001, '094 C2.

cause the cleaning section to move to the cleaning
position to initiate a subsequent cleaning cycle as a
following stall is arriving at the cleaning location.

## II.   ANALYSIS

### A.   Claim Construction

"A claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. § 42.100(b); *see In re Cuozzo Speed Tech., LLC*, ---F.3d---, 2015 WL 448667, *7 (Fed. Cir. Feb. 4, 2015) ("We conclude that Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA.").  Under that standard, the claim language should be read in light of the specification, as it would be interpreted by one of ordinary skill in the art.  *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010).  Thus, we generally give claim terms their ordinary and customary meaning.  *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007) ("The ordinary and customary meaning is the meaning that the term would have to a person of ordinary skill in the art in question.") (internal quotation marks omitted).

We expressly interpret below only those claim terms that require analysis to resolve arguments related to the patentability of the challenged claims; all other terms will be accorded their ordinary and customary meaning as would be understood by one of ordinary skill at the time of the invention.

### 1.   *"stalls passing by said cleaning location"*

In its Preliminary Response, Patent Owner argued that the phrase "said stalls passing by said cleaning location" requires that the stalls, and the

7

platform on which they are mounted, be in "continuous" motion past the cleaning location. Prelim. Resp. 2. In other words, under Patent Owner's interpretation, the language would not encompass intermittent movement in which a stall arrives at the cleaning location, pauses, and then moves past the cleaning location. But in the decision to institute, the panel construed "stalls passing by said cleaning location" according to its ordinary and customary meaning and not to required continuous rotation of the stalls. Dec. 11.[8]

Patent Owner renewed its proposed construction at trial, primarily relying, as it did before institution, on the Specification's description of an embodiment in which "platform 22 *rotates continuously*." PO Resp. 18. (citing Ex. 2001, 4:12–14 (emphasis added)). Patent Owner also relies on the May 5, 2013 "Notice of Intent to Issue Ex Parte Reexamination Certificate," ("NIRC"), issued in *ex parte* reexamination no. 90/012,285 ("the '285 Reexam"), in which the Examiner confirmed the patentability of the '094 patent claims. *Id*. (citing Ex. 2010, 5). Patent Owner cites the NIRC for the proposition that "[the '094 patent] specifically requires that the insertion and retraction of the cleaning section occur 'with said stalls passing by said cleaning location,'" i.e., that the cleaning section moves while the stalls are moving. *Id*. According to Patent Owner, such continuous movement of the platform is necessary to allow "the carousel itself as a timing unit to synchronize movement of the cleaning section relative to the

---

[8] Patent Owner also argued, in its Preliminary Response, that claim 1 requires that the retraction of the cleaning section be triggered by the location sensor. Prelim. Resp. 10–11. But in the Institution Decision, the panel determined that claim 1 only requires that the *deployment* of the cleaning section be triggered by the location sensor. *Id*. at 11–13. Patent Owner does not challenge this determination in its Response.

IPR2013-00575
Patent 6,443,094 C2

stall so as to avoid tripping up the cow standing therein." *Id*. Petitioner disagrees with Patent Owner's proposed construction, arguing, *inter alia*, that the construction improperly imports a feature from the specification into the claims. Pet. Reply 7 (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

"As with any claim construction analysis, we begin with the claim language." *In re NTP, Inc.*, 654 F.3d 1279, 1288 (Fed. Cir. 2011) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc)). We find nothing in claim 1—or, for that matter, any of its dependent claims—that requires the stalls to be capable of moving past the cleaning location in a continuous manner, or that excludes intermittent movement past the cleaning location. For example, claim 1 refers several times to the stalls being "at" the cleaning location, which seems to encompass the possibility that the stalls are briefly stopped at the cleaning location. Ex. 1001, 9:14–15, 18–19, 29.

Further, we agree with Petitioner that the Specification does not mandate the narrower construction that Patent Owner proposes. Patent Owner is correct that the Specification describes an embodiment in which the platform "rotates continuously." Ex. 1001, 4:11–12. But "while the specification [should be used] to interpret the meaning of a claim, courts must not import[] limitations from the specification into the claim." *In re Trans Texas Holdings Corp.*, 498 F.3d 1290, 1299 (Fed. Cir. 2007) (alterations in original) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005 (en banc) (internal quotation marks omitted)). It is only when "the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction" that the scope of a

9

IPR2013-00575
Patent 6,443,094 C2

claim is properly restricted to that of a disclosed embodiment. *Liebel-Flarsheim*, 358 F.3d at 906. Patent Owner does not direct us to any language in the Specification that it asserts demonstrates such a clear intention to limit the claim scope. Nor do we find any such language. We are also unable to find support in the Specification for Patent Owner's contention that continuous movement of the platform is required to "avoid tripping up the cows" when the cleaning section deploys and retracts. As for the NIRC, although statements made during the prosecution history, including reexamination proceedings, may be relevant to determining claim scope, *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1439 (Fed. Cir. 1988), we are unable to find anything in the NIRC that disclaims the scope of claim 1 to exclude intermittent motion, or that otherwise supports Patent Owner's interpretation.

Accordingly, we construe the language "said stalls passing by said cleaning location" according to its ordinary and customary meaning, which encompasses both continuous and intermittent motion.

### 2. *a plurality of milking stalls arranged on a moving platform*

Petitioner contended in its Petition that the phrase "a plurality of milking stalls arranged on a moving platform" constitutes "structural limitations of the claims," even though the phrase appears in claim 1's preamble. Pet. 7–8. Patent Owner did not dispute this contention in either its Preliminary Response or Patent Owner Response. We agree with Petitioner that the body of claim 1 "expressly refers and relies upon both the plurality of stalls and the moving platform on which they are arranged to

IPR2013-00575
Patent 6,443,094 C2

define structural recitations in the claim." *Id*.  Accordingly, we agree that claim 1 calls for a moving platform having a plurality of stalls.

> B.    *Claims 1 and 4–9, Anticipation by Rose*

Petitioner contends that Rose describes each limitation in claims 1 and 4–9, and therefore anticipates the claims under 35 U.S.C. § 102(b).  Pet. 11–23.  In support of this contention, Petitioner provides a claim chart demonstrating where Rose discloses each limitation of the claims, as well as the declaration testimony of Jonathan Cagan, Ph.D, P.E.  *Id*.; Ex. 1011 (Cagan Decl.).

> 1.    *Rose*

Rose describes a spray device for automatically disinfecting cows' udders after milking.  Ex. 1002, 1:9–26.  The device is intended to be installed at "one or more locations around the periphery of the rotatable platform" of a "rotary type animal milking and/or treatment apparatus."  Ex. 1002, 1:27–41.  Figure 1 of Rose, reproduced below, depicts Rose's automated spray device.

IPR2013-00575
Patent 6,443,094 C2



As shown in Rose Figure 1, Rose's automated spray device comprises swing arm 10 pivotally mounted to rump rail 12 of a rotary type milking apparatus, the milking apparatus including rotatable platform 13 that rotates about a vertical axis relative to rump rail 12. *Id*. at 1:69–75. Piston and cylinder device 15, pivotally mounted to support 14, extends from rump rail 12 and actuates swingable spray arm 23. *Id.* at 1:78–83.

In operation, a cam on rotating platform 13 contacts actuating switch 33, which activates solenoid 31 via timing relay 32. *Id*. at 2:29–32, Fig. 4. Solenoid 31 in turn activates vacuum control valve 17, causing piston and cylinder device 15 to pivot swing arm 10 from a retracted position (indicated in dotted lines) to a cleaning position between the hind legs of the cow standing on platform 13. *Id*. at 2:25–39. Spray nozzles 24 dispense a sanitizing liquid over the cow's udders. *Id*. at 2:42–46. After a period of time determined by timing relay 32, solenoid 31 deenergizes, activating vacuum control valve 17 to cause piston and cylinder device 15 to pivot swing arm 10 back into the inoperative position. *Id*. at 2:49–55.

IPR2013-00575
Patent 6,443,094 C2

Two spray devices may be provided on the rotary-type milking apparatus, one of which is located near the position where the cows exit platform 13. *Id.* at 2:58–65. Rose twice refers to UK Patent 1,398,596 (i.e., Chandler, described below) as an example of a rotary-type milking apparatus suitable for use with Rose's automated spray device. *Id.* at 1:75–78; 2:74–77.

    2.   *Analysis*

        a.   <u>Claim 1</u>

A prior art reference anticipates a patent claim under 35 U.S.C. § 102 if it discloses every claim limitation in the claimed arrangement. *In re Montgomery*, 677 F.3d 1375, 1379–80 (Fed. Cir. 2012). Patent Owner makes two arguments against a determination that Rose anticipates claim 1. First, Patent Owner argues that Rose does not disclose the "plurality of milking stalls." PO Resp. 9. Second, Patent Owner argues that Rose does not disclose a cleaning location that is "intermediate to the milk extracting location and the exit location." *Id*. at 9–10. We disagree on both counts.

Regarding the plurality of milking stalls, Rose teaches attaching its spray device to the rump rail of the rotary type milking apparatus described in Chandler, which apparatus has a plurality of milking stalls. Ex. 1004, 1:9–22, Fig. 1. Because Rose teaches using its spray device with Chandler's milking apparatus, and Chandler's milking apparatus comprises a rotating platform with a plurality of milking stalls, a person of ordinary skill would have known that Rose teaches attaching its spray device to a milking apparatus having a plurality of milking stalls. *See In re Baxter Travenol Labs*, 952 F.2d 388, 390 (Fed. Cir. 1991) (holding that because a prior-art reference "referred to Baxter's commercial system and Baxter's commercial

13
**– A13 –**

IPR2013-00575
Patent 6,443,094 C2

systems utilized a DEHP-plasticized primary bag, it is clear that one skilled in the art would have known that [the reference] was referring to a DEHP-plasticized primary bag").

We also agree with Petitioner that Rose describes a cleaning location between the milking location and exit locations.  Rose teaches that one of the purposes of its automated spray device is to replace the manual udder cleaning that occurs on a rotating platform after the cows are milked.  Ex. 1002, 1:19–24, 2:7–12.  Such cleaning necessarily would take place after the milking location and before the exit location.  Moreover, Rose teaches locating the spray device near to the position where the cows leave the platform 13, i.e., before the exit location.  *Id*. at 2:62–65.  Therefore, Rose makes clear that its device is to be installed between the milking location and the exit location.

After considering Petitioner's and Patent Owner's positions, as well as their supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence that claim 1 is unpatentable under 35 U.S.C. § 102(b) as anticipated by Rose.

b.    <u>Claims 4–6</u>

Claim 4 depends from claim 1 and additionally recites that "said location sensor responds to location elements which are arranged to move synchronously with said moving platform and are at spaced locations corresponding to spacing of said stalls."  Claim 5 depends from claim 4 and additionally recites that "said location sensor is a contact sensor and said location elements are arranged to come into contact with said location sensor as said platform moves."  Claims 6 depends from claim 5 and additionally recites that "said location elements are physical components of the milking

14

IPR2013-00575
Patent 6,443,094 C2

parlor which move sequentially into engagement with the location sensor during movement of the platform." Petitioner contends that Rose's actuating switch 33, 31' corresponds to the claimed location sensor, and that cams mounted to the moving platform at each stall location, which contact the actuating switch to actuate the spray device, correspond to the claimed location elements. Pet. 17; *see* Pet. 21–22 (citing Ex. 1002, 2:19–24, 74–77, 3:2–3, Fig. 5: Ex. 1004, 2:62–67). Patent Owner does not argue separately the patentability of claims 4–6, and thus does not dispute these contentions. We agree with Petitioner, and find that Rose discloses the claimed location sensor and location elements. Accordingly, we determine that the preponderance of the evidence of record demonstrates that Rose anticipates each of claims 4–6.

c.    Claims 7–9

Claim 7 depends from claim 1 and additionally requires that "said cleaning section comprises an extension arm on which a cleaning fluid dispensing portion is positioned, and said extension arm moves on a path of travel from the retracted position to the cleaning position where at least a portion of said extension arm is beneath the cow which is in the stall at the cleaning location." Claim 8 depends from claim 7 and additionally recites that "said extension arm is arranged so that the path of travel extends between two legs of the cow." Claim 9 depends from claim 8 and additionally requires that "said path of travel extends between two hind legs of the cow." Petitioner contends that Rose's spray arm 23 and spray nozzles 24 correspond to the claimed extension arm and cleaning fluid dispensing portion, respectively. Pet. 18 (citing Fig. 1). According to Petitioner, Rose teaches that the path of travel for the spray device is between the cow's hind

15

IPR2013-00575
Patent 6,443,094 C2

legs. *Id.* (citing Ex. 1002, 2:37). Patent Owner does not separately argue the patentability of claims 7–9, and thus does not dispute these contentions. We agree with Petitioner, and find that Rose discloses the claimed extension arm and cleaning fluid dispensing portion, arranged so that the path of travel extends between the two hind legs of the cow. Accordingly, we determine that the preponderance of the evidence of record demonstrates that Rose anticipates claims 7–9.

C.   *Claims 1 and 4–9, Obviousness over Rose and Chandler*

Petitioner argues that claims 1 and 4–9 would have been obvious over Rose and Chandler. Pet. 26–36.

1.   *Chandler (Ex. 1004)*

Chandler is a British patent relating to an animal milking apparatus. The animals are carried in stalls provided on a platform that rotates intermittently, each stop bringing one animal in line with an exit and another in line with an entry. Figure 1, reproduced below, depicts Chandler's milking apparatus.

IPR2013-00575
Patent 6,443,094 C2



Figure 1 of Chandler.

As shown in Figure 1, when platform 10 is stationary, stall 12 is presented in line with entry 23, and a cow enters via a ramp. Platform 10 is rotated, carrying the cow to the next station where operator No. 1 washes the cow's udders and applies teat cups 17. As the platform continues to be rotated, the cow is automatically milked. Eventually, the cow reaches operator No. 2 (*see* Fig. 9), who removes the teat cups. *Id.* at 3:34–37. With each stop of platform 10, another cow enters via entry bridge 23, while another exits via bridge 24. *Id.* at 3:29–33. Chandler discloses using cam members 57, mounted below each stall 12 on track 26, to engage stop/start switch 55 as platform 10 is rotated from one center of a stall to the next. *Id.* at 2:60–67, Fig. 4. While the figures of Chandler depict the cows facing in toward the center of the platform hub, the Specification indicates that stalls 12 may be arranged in a herringbone pattern, where the cows face outwardly. *Id.* at 3:61–67.

17

IPR2013-00575
Patent 6,443,094 C2

2.    *Analysis*

a.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103(a) "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains."  35 U.S.C. § 103; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). The level of ordinary skill in the art usually is evidenced by the references themselves.  *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

b.    Claim 1

Petitioner contends that "[i]t would have been obvious to one skilled in the art to provide Rose's platform with Chandler's platform mounted stalls to achieve the same and predictable result of securing and orienting cows when they are present on the rotating platform."  Pet. 25.  Petitioner further argues that it would have been obvious "in light of Chandler to provide Rose's described switch-actuating cam as one of a plurality of such cams spaced in correspondence with the spacing of the stalls, in order to provide the same and predictable result of triggering the desired automatic operation of Rose's automated spray device each time a cow is presented to the cleaning location."  *Id.*  Moreover, according to Petitioner, a person of

18

IPR2013-00575
Patent 6,443,094 C2

ordinary skill would have been motivated to combine Rose and Chandler
because, *inter alia*, "Rose expressly points the skilled artisan to the
disclosure in Chandler." *Id.*

Patent Owner argues that Petitioner—or at least Petitioner's expert,
Dr. Cagan—based the obviousness analysis on an incorrect level of ordinary
skill. *See* PO Resp. 13 ("Dr. Cagan is urging the creation of a person with
extraordinary skill in the art . . . and tailored to create the exact invention he
has been asked to examine."). Patent Owner urges us to adopt Dr. Mein's
opinion as to the level of ordinary skill. *Id.* at 16. Dr. Mein, however,
advocates a higher level of ordinary skill than does Dr. Cagan. Dr. Mein
criticizes Dr. Cagan's proposed level of ordinary skill as "[m]ere mastery of
automation," which Dr. Mein states is "not sufficient." Ex. 2012 ¶ 29.
Instead, argues Dr. Mein, "the true definition of a person skilled in the
art . . . is one with an unusually wide range of skills including design
engineering, dairy science, cow behavior, dairy microbiology, the chemistry
of cleaning of milking equipment and, preferably, a practical appreciation of
the working conditions and attitudes of milking staff with (typically) limited
education." *Id.* But the challenged claims are at least as likely to have been
obvious to someone having this level of skill than to someone having the
level of skill that Dr. Cagan advocates. *See Innovention Toys, LLC v. MGA
Entertainment, Inc.*, 637 F.3d 1314, 1323 (Fed. Cir. 2011) ("A less
sophisticated level of skill generally favors a determination of
nonobviousness . . . while a higher level of skill favors the reverse"). Thus,
we need not resolve the parties' dispute over the level of ordinary skill
because our obviousness determination would be the same under either

19

IPR2013-00575
Patent 6,443,094 C2

standard. In any event, we determine that the level of ordinary skill is best evidenced by the references themselves, particularly Rose and Chandler.

Patent Owner also argues that the combination of Rose and Chandler does not teach all of claims 1's limitations, because the combination does not teach that the plurality of milking stalls must be in continuous motion as they pass by the cleaning location. *See* PO Resp. 18 (asserting that "Dr. Cagan's conclusion of obviousness cannot be upheld" because Dr. Mein concludes that the combination of Rose and Chandler "could only work in the context of an intermittent carousel"). But we determined above that claim 1 does not require the milking stalls to move continuously past the cleaning location. Therefore, this argument is unpersuasive.

Finally, Patent Owner argues that any evidence of obviousness is overcome by its showing of long-felt but unmet need for "automated teat sanitization." PO Resp. 22. According to Patent Owner, "if *Rose* or the *Rose/Chandler* combination were such as to render the instant Claim 1 obvious, economic forces would have created a commercial race to the teat sprayer." PO Resp. 22. Relying on the testimony of its expert, Dr. Mein, Patent Owner asserts that the need for an automated udder sanitizer became apparent when dairies in New Zealand and Australia adopted automated cluster pullers, which would have eliminated the need for one laborer but for the continued need to disinfect the udders manually after milking. *Id*. at 22–23; Ex. 2012 ¶ 36. Petitioner responds that Patent Owner does not support its assertion of long-felt but unmet need with objective evidence, and does not identify any claimed features that are responsible for satisfying the need. Pet. Reply 11–12.

20

IPR2013-00575
Patent 6,443,094 C2

"Evidence that an invention satisfied a long-felt and unmet need that existed on the patent's filing date is a secondary consideration of nonobviousness." *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332 (Fed. Cir. 2009). In the present case, however, we are not persuaded that there was a long-felt but unmet need for "automated teat sanitization" that existed on the patent's filing date, as Patent Owner argues, because any such need would have been met by Rose's automated teat spray device. *See Geo. M. Martin Co. v. Alliance Machine Systems Int'l, LLC*, 618 F.3d 1294, 1304–05 (Fed. Cir. 2010) ("Where the differences between the prior art and the claimed invention are as minimal as they are here, however, it cannot be said that any long-felt need was unsolved.").

As discussed above (Sec. II.B.2.a), we find that Rose and Chandler disclose all of the limitations of claim 1, arranged as in the claim. Further, we agree with Petitioner that a person of ordinary skill would have been motivated to combine Rose and Chandler because, *inter alia*, "Rose expressly points the skilled artisan to the disclosure in Chandler." Pet. 25. After considering Petitioner's and Patent Owner's positions, as well as their supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence that claim 1 is unpatentable under 35 U.S.C. § 103(a) over Rose and Chandler.

c.   <u>Claims 4–9</u>

Patent Owner does not separately argue the patentability of claims 4–9. As discussed above (Sec. II.B.2.b–c), Rose and Chandler teach all of the additional limitations of claims 4–9. Therefore, upon review of claims 4–9, as well as the contentions and evidence relied upon by Petitioner, we

IPR2013-00575
Patent 6,443,094 C2

determine that the preponderance of the evidence of record demonstrates that claims 4–9 would have been obvious over Rose and Chandler.

     D.    *Claims 2 and 3, Obviousness over Rose, Chandler, and Ornerfors*

Claim 2 depends from claim 1 and further recites "a presence detector to detect the presence of a cow in a stall which is at the cleaning location." Claim 3 depends from claim 2 and further requires that "said presence detector comprises an electromagnetic detector which directs an electromagnetic wave toward the stall at the cleaning location and responds to the electromagnetic wave encountering a cow in the stall at the cleaning location to permit the cleaning cycle to take place." Petitioner relies on Ornerfors to teach these additional limitations. Ornerfors describes an apparatus for automatically detecting the location of a cow's teat to facilitate, e.g., cleaning the teat after milking. Ex. 1005, 2:1–4, 4:21–23, 7:3–5, Figs. 1a, 1d. In one embodiment, a signal reflecting means, such as a metal plate or microchip, is applied onto or near the end of the teat. *Id*. at 7:3–5, 10:5–8, Fig. 5. Sensing means 8, such as a combined transmitter/receiver, sends a signal to the signal reflecting means, which returns the signal to the transmitter receiver to identify the teat's location. *Id*. at 10:8–13.

Petitioner contends that the signal transmitter/receiver necessarily sends electromagnetic radiation to the signal reflecting means and receives reflected electromagnetic radiation from the signal reflecting means. Pet. 38. Petitioner further contends that "Ornerfors and Rose address the same technical feature of automatically positioning a spray arm beneath a cow's udder for post-milking treatment with a disinfecting spray," and that "[o]ne

IPR2013-00575
Patent 6,443,094 C2

skilled in the art would have recognized Ornerfors' electromagnetic teat location sensor as useful in Rose for the same purpose it is described in Ornerfors—to guide the spray arm to a precise position beneath each teat." *Id*. at 39–40.

Patent Owner does not dispute Petitioner's characterization of Ornerfors or its contention that one of ordinary skill would be motivated to combine Ornerfors with Rose and Chandler. Instead, Patent Owner argues that Ornerfors "discloses nothing that would set forth a moving carousel, nor any of the sensing electronics which would indicate when a stall had arrived for teat sanitation." PO Resp. 25. But Ornerfors is not relied to teach a moving carousel or a device that determines when a stall moves into the cleaning location; Rose and Chandler are relied on for those teachings. Pet. 18–20 (claim chart). Therefore, Patent Owner's argument is not persuasive. *See In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references.").

After considering Petitioner's and Patent Owner's positions, as well as their supporting evidence, we determine that Petitioner has shown by a preponderance of the evidence that claims 2 and 3 are unpatentable under 35 U.S.C. § 103(a) over Rose and Chandler.

### E.    *Claim 10, Obviousness over Rose, Chandler, and Phillips*

Claim 10 depends from claim 8, which depends from claim 1. Claim 8 additionally recites that the "extension arm is arranged so that the path of travel extends between two legs of the cow." Claim 10 further recites that the "extension arm is arranged so that the path of travel extends between a

23

IPR2013-00575
Patent 6,443,094 C2

front leg and a hind leg of the cow." Petitioner relies on Phillips to teach these additional limitations. Pet. 43–45.

Patent Owner does not separately argue the patentability of claim 10, but instead relies on arguments raised in support of the patentability of claim 1 (PO Resp. 25), which we found unpersuasive. Upon review of claim 10, as well as the contentions and evidence relied upon by Petitioner, we determine that the preponderance of the evidence of record demonstrates that claim 10 would have been obvious over Rose, Chandler, and Phillips.

*F.    Motion to Amend*

Patent Owner moves to substitute claims 11–20 for challenged claims 1–10 if we determine that the challenged claims are unpatentable. Mot. to Amend. 2–3. As stated above, we determine that Petitioner has demonstrated by a preponderance of the evidence that all of the challenged claims are unpatentable. Therefore, Patent Owner's motion is before us for consideration. For the reasons set forth below, Patent Owner's motion is *denied*.

Proposed substitute claim 11 is an amended version of independent claim 1. *Id*. at 2. Proposed substitute claims 12–20 are identical to and would replace claims 2–10, but would depend from claim 11 rather than claim 1. *Id*. at 3. Proposed substitute claim 11, with changes to claim 1 indicated, is reproduced below:

> 11.    A system for cleaning udders of cows in a milking parlor, where there is a plurality of milking stalls arranged on a moving platform to move through a milking cycle, and said parlor comprises a milk extracting region where milking machines extract milk, and an exit location, said system comprising:
>    a) an udder cleaning apparatus positioned at a cleaning location intermediate the milk extracting location and

24

> the exit location, with said stalls passing by said cleaning location <u>in continuous motion throughout the milking cycle</u>, said cleaning apparatus comprising:
>
> i) a mounting structure at the cleaning location;
>
> ii) a cleaning section which is movable between a retracted position which is out of a path of travel of the stalls and a cleaning position when the cleaning section discharges cleaning fluid to clean an udder of the cow which is in one of said stalls which is at the cleaning location;
>
> b) a control section comprising a location sensor responsive to location of the stalls and to provide signals identifying arrival times at which each of the stalls is at the cleaning location, said control section being arranged to cause the cleaning section to move, relative to the arrival times, from the retracted position to the cleaning position to discharge said cleaning fluid toward the udder of the cow, then to retract the cleaning section [form] <u>from</u> the cleaning position to complete a cleaning cycle, and when the stall in the cleaning location moves from the cleaning location, to again cause the cleaning section to move to the cleaning position to initiate a subsequent cleaning cycle as a following stall is arriving at the cleaning location.

Mot. to Amend. 8–9.

As the movant, Patent Owner bears the burden of demonstrating, by a preponderance of the evidence, that the proposed substitute claims are patentable.  37 C.F.R. § 42.20(c); *see* 37 C.F.R. § 42.1(d) (noting that the "default evidentiary standard [in proceedings before the Board] is a preponderance of the evidence").  To demonstrate patentability, Patent Owner must, *inter alia*, demonstrate that the proposed substitute claims are patentable over the prior art of record, as well as prior art not of record but

IPR2013-00575
Patent 6,443,094 C2

known to the patent owner. *Idle Free Sys., Inc. v. Bergstrom, Inc.*, Case IPR2012-00027, slip op. at 7 (PTAB June 11, 2013) (Paper 26).

In its Motion, Patent Owner asserts that the proposed claims are patentable over two references not of record, but does not address the patentability of the proposed claims over the prior art for which trial was instituted, primarily Rose and Chandler. Mot. to Amend. 12–13. Patent Owner's failure to address the art of record is fatal to its motion, as the patentability of substitute claim 11 over Rose and Chandler is far from self-evident. It is undisputed that the feature that Patent Owner seeks to add to claim 1, a continuously rotating milking platform, was "conventional" at the time of the invention. *See* Ex. 1001, 3:47–48, 4:11–12 (continuously rotating platform 22 part of "conventional" milking parlor 22). Indeed, Patent Owner's expert testifies that at the time the '094 patent was filed, "the overwhelming majority of rotary parlors in all major dairying nations incorporated continuously moving platforms." Ex. 2012 ¶ 35. Thus, proposed claim 11 would represent the combination of a known and commonly used milking apparatus with Rose's automated spray device. Neither Patent Owner nor its expert contend that it would have been beyond ordinary skill at the time of the invention to modify Rose's automated spray device so that it could be used on a milking apparatus with a continuously rotating platform. *See* Tr. 36:12–17. Patent Owner has not given us any reason not to conclude that proposed claim 11 is simply the "combination of familiar elements according to known methods . . . yield[ing] predictable results." *KSR*, 550 U.S. at 416. Thus, based on the current record, Patent Owner has not carried its burden of demonstrating that proposed claim 11 is patentable over the prior art of record.

26

IPR2013-00575
Patent 6,443,094 C2

## III.    CONCLUSION

Petitioner has shown by a preponderance of the evidence that claims 1–10 of the '094 patent are unpatentable under 35 U.S.C. § 102(b) and 35 U.S.C. § 103(a).  Patent Owner's Motion to Amend is denied.

## IV.    ORDER

Accordingly, it is

ORDERED that claims 1–10 of the '094 patent are held unpatentable; and

FURTHER ORDERED that Patent Owner's Motion to Amend is *denied*.

This is a final decision.  Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.


PETITIONER:

Jeffrey R. Snay
Jeff Goehring
Douglas V. Rigler
Young & Thompson
JSnay@Young-Thompson.com
JGoehring@Young-Thompson.com
DRigler@Young-Thompson.com


PATENT OWNER:

Mark L. Lorbiecki
Michael J. Folise
Lowe Graham Jones PLLC
Lorbiecki@LoweGrahamJones.com
Folise@LoweGrahamJones.com



US006443094B1

(12) **United States Patent**
DeWaard

(10) Patent No.: **US 6,443,094 B1**
(45) Date of Patent: **Sep. 3, 2002**

(54) **METHOD AND APPARATUS FOR CLEANING THE UDDER OF A COW**

(76) Inventor: **Dave DeWaard**, 8540 Benson, Lynden, WA (US) 98264

( * ) Notice:     Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/698,433**

(22) Filed:     **Oct. 25, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/170,153, filed on Dec. 10, 1999.

(51) Int. Cl.$^7$ ................................................. **A01J 3/00**
(52) U.S. Cl. ................................................. **119/14.18**
(58) Field of Search ........................... 119/14.01, 14.02, 119/14.03, 14.08, 14.18, 666, 667

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,275,124 A | * | 1/1994 | van der Lely et al. .... 119/14.08 |
| 5,630,379 A | * | 5/1997 | Gerk et al. .................. 119/667 |
| 5,678,506 A | * | 10/1997 | van der Berg et al. ... 119/14.18 |
| 5,769,025 A | * | 6/1998 | van der Lely et al. .... 119/14.42 |
| 5,865,138 A | * | 2/1999 | van der Lely et al. .... 119/14.02 |
| 6,079,359 A | * | 6/2000 | van der Berg .......... 119/14.01 |
| 6,148,766 A | * | 11/2000 | van der Lely .......... 119/14.08 |

* cited by examiner

*Primary Examiner*—Thomas Price

(57)     **ABSTRACT**

A method apparatus for teat dipping for sanitizing the udder of a cow either before or after milking. The apparatus has an extension arm with a dispersion portion so that when a cow is in a cleaning location the extension arm will extend underneath a cow's udder and dispersed cleaning fluid onto the cow's udder. A sensing system is used that detects the rotation of the parlor to determine if a cow is at a cleaning location. Further, the sensing system detects whether a cow is present in a stall of the rotary milking parlor.

**10 Claims, 8 Drawing Sheets**



DeLaval International AB
Exhibit 1001

FIG. 1



# FIG. 2



# FIG. 3



# FIG. 4



## FIG. 5



# FIG. 6



FIG. 7



FIG. 8



FIG. 9



US 6,443,094 B1

| 1 | 2 |

## METHOD AND APPARATUS FOR CLEANING THE UDDER OF A COW

This application claims priority from provisional application Ser. No. 60/170,153, filed Dec. 10, 1999.

### FIELD OF THE INVENTION

The invention relates to a new and improved cow udder cleaning or sanitizing apparatus and method to be used in a milking parlor, and more particularly to an automated system that sprays disinfectant onto a cow's udder.

### BACKGROUND

In a typical milking operation a claw is connected to the cow's udder to extract the milk by providing a low pressure to draw the milk out from the udder. When a cow is finished being milked the cow's udder must be cleaned with a disinfectant such as iodine to prevent infection. Traditionally this process is accomplished by a person who cleaned each udder by hand with a spraying device. This required having an extra person on staff and oftentimes the udder was not thoroughly cleaned.

The present invention comprises an automated cleaning system that cleans a cow's udder with a disinfectant such as iodine before or after she has been milked. The system is to be implemented in a circular milking parlor that basically consists of a circular platform about 40–100 ft. in diameter that concentrically rotates about its center. The circular platform has 20–100 slots (i.e. stalls) around the perimeter where cows stand while being milked. The cows are facing radially inward toward the center and are separated by radially extending rails. There is a fixed railing that circumferentially surrounds the circular platform and the platform rotates 360 degrees in a six to twenty minutes while the cows are being milked. After about 180 degrees of rotation from the location where the cow has entered the slot, the milking of the cow has been completed and the milking gear is automatically removed from a cow's udder.

This apparatus of the present invention comprises a movable swivel arm that is activated by sensors that cause the arm to move to a location in-between the cow's legs and spray the udder with disinfectant. The portion of the arm that extends radially inwardly between the cow's hind legs is made of a flexible, durable material. At the end of this arm portion is a nozzle for dispensing disinfectant. The cleaning apparatus remains at a fixed position at a location after from the location where the cow enters. The apparatus is mounted on a fixed railing (or other stationary structure) that circumferentially extends around the rotating circular platform and the cleaning of the cow's udder is the last part of the milking procedure before a cow backs out of a stall after about 300–350 degrees of travel from where she entered the stall.

### BACKGROUND ART

The U.S. Pat. No. 5,678,506 Van der Burg et al. patent discloses the broad concept of automatically dispensing disinfectant to a cow after it has been milked. More specifically as seen in FIGS. 1 and 2, milking robot 8 is movably connected to upper frame portion 4 so it can slide left or right in FIG. 1. The position and orientation of the cow and exactly how the arm 46 gets under the cow is not completely understood. Apparently the robot arm 46 is positioned in under the cow by cylinders 47 and 52 and teat cups 53 and 54 engage the teats (see FIG. 2, plan view of the apparatus). The arms 44 and 45 are raised to engage the teats and lowered to disengage after milking.

The post milking cleaning system (as described in column 12 line 38+) as shown in FIGS. 16 and 17 comprises a spray nozzle 108 positioned at the end of robot arm 46. This spray nozzle 108 discharges a fan-shaped spray pattern forward in front of the teat cups.

The following patents also turned up in the applicant's search. These are less relevant and are grouped by manual dispensing systems, timed stationary apparatuses and chemical germicides. The manual systems include:

U.S. Pat. No. 5,711,251 Green et al, shows a germicide applicator for cow udder that utilizes a dispensing wand. Valves allow metering of both lactic acid and sodium chlorite. As seen in FIG. 1, supplies 12 and 14 each hold these liquids. Pump 16 delivers liquid through the check valves 54 and 24 and through the lines 32. The reservoir 28 contains a float switch 60. When the fluid level is low in reservoir 28 the float switch sends a signal to the OR gate 64 which emits a signal to deactivate the pressure source 58. Return line 50 allows a return passage for fluid through manual valve 54.

U.S. Pat. No. 2,731,300 Jansen, shows a cow washer that assists an operator to manually clean a cow's udder. FIGS. 5 and 6 shows a nozzle means 18 where ball 31 will cut off communication with wither nozzle 22 or 23, whichever is beneath the other. As seen in FIG. 2 the nozzle means 18 can be rotated 180 degrees to use nozzle 23 which may have a different spray width.

The timed stationary system patents include:

U.S. Pat. Nos. 5,685,262 & 5,101,770 Stevenson, shows a post-milking and pre-milking udder care system. As seen in FIGS. 2 and 3 the applicator 20 comprises nozzles 23 to dispense liquid. The dispersion of liquid through applicator 20 is controlled by the control knob 10 (FIG. 1).

U.S. Pat. No. 3,554,166 Belden, shows an udder spraying device such as the ones used in the above cited Stevenson patents U.S. Pat. Nos. 5,685,262 and 5,101,770. As seen in FIG. 3 the carriage plate 53 slides along the upper surface of a support plate 58 so the spraying unit may be positioned under the cow.

U.S. Pat. No. 1,968,564 Luks, shows a milking parlor in which there are spray nozzles directed at the cow's upper region. The spray nozzles 17 and 49 are activated by valve 61 that can be changed by lever 62.

The chemical patents are as follows:

U.S. Pat. No. 5,776,479 Pallows et al, discloses a germicidal teat dip to reduce or prevent mastitis.

U.S. Pat. No. 4,466,959 Lauermann et al, is directed to a compound for the disinfecting of teats.

U.S. Pat. No. 4,288,428 Foll et al, relates to an udder disinfecting preparation comprising an iodophor.

None of the disclosures disclose a cow udder cleaning apparatus that can be retrofitted to an existing milking parlor that consistently and accurately administers disinfectant to a cow's udder.

### SUMMARY OF THE INVENTION

The present invention is a cow udder dipping apparatus which can clean or disinfect a cow's udder before or after she has been milked where the apparatus has a mounting structure which moves with respects the location of the cows to be cleaned. Located on this mounting structure is a positioning system which comprises an extension arm and actuator. The extension arm has a path of travel which is adapted to extend underneath the udder of the cow which is in a cleaning location to a cleaning position. When the

US 6,443,094 B1

3

extension arm is in the cleaned position a dispersion portion on the extension arm sprays cleaning or disinfecting material onto the cow's udder. The actuator then withdrawals the extension arm into a protracted position.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 shows a plan view of a prior art milking operation incorporating the present invention;

FIG. 2 is a side elevation view of a cow udder cleaning apparatus that is attached to the perimeter railing of a milking operation with the cleaning arm of the present invention in its retracted position;

FIG. 3 is a rear view of a cow udder cleaning apparatus, looking inwardly toward the center of the platform of the milking parlor;

FIG. 4 is a side elevational view of the cow udder cleaning apparatus where the swing arm member is positioned in between a cow's legs and is dispersing a disinfectant;

FIG. 5 is a side elevational view of a second embodiment of the apparatus of the present invention;

FIG. 6 is a side elevational view of a third embodiment of the apparatus of the present invention;

FIG. 7 is a fourth embodiment of the apparatus of the present invention where it is employed in a herringbone design rotary platform parlor;

FIG. 8 is a fifth embodiment where the apparatus of the present invention is employed in a circular milking parlor where the swing arm rotates in the horizontal plane to the side portion of the cow;

FIG. 9 is a sixth embodiment where the apparatus of the present invention is employed in a circular milking parlor where the swing arm also rotates in a horizontal plane but the extension travels between the hind legs of the cow.

## DETAILED DESCRIPTION OF THE PRESENT INVENTION

First there will be a brief discussion of the overview of a cow milking operation and the various stages of its operation; next there will be a brief overview of the operation of the present invention; and finally there will be a detailed description of the embodiments of the present invention. The invention relates to teat dipping or referred otherwise referred to as cow udder cleaning or cow udder sanitizing.

As seen in FIG. 1, there is conventional milking parlor 20 that comprises a rotating platform 22 on which the cows 24 are standing during milking, and a perimeter railing 26 surrounding the platform 22. The cow udder cleaning apparatus of the present invention is shown at 28. The platform 22 is about forty to one hundred feet in diameter and makes a complete rotation once about every six to twenty minutes. The plate 22 comprises a plurality of stalls 42 that each one comprises a milking claw and vertical bars 43.

The milking operation has six stages and there are six locations that correspond to six physical proximate locations of a cow at which certain operations are executed through the milking operation. There is the entry location 30, the claw attachment location 32, the milk extraction location 34, the claw removal location 36, the udder cleaning location 38 and finally the exit location 40. In general, the milking operation comprises the first steps where the cow steps onto the platform 22 and into a stall 42 at the entry location 30. The milking operator quickly washes the udder of the cow 24 to remove dirt and then manually places the claw upon the cow's udder at the claw attachment location 32. From

4

hereon no manual intervention is required with the present invention 28 employed. The next phase is the milk extraction which occurs at the milking location 34, and after ninety degrees to one hundred and thirty degrees of rotation of the platform 22 the cows enter the claw removal section 36 where a spring loaded device will withdraw the claw to the side of the stall 42 clear of the cow's feet. After the claw is removed the cow's udder is to be cleaned with iodine or other disinfectant by the cow udder cleaning device 28 of the present invention. The final step occurs at the claw removal 40 where the cows back out of the stall. The platform 22 rotates continuously, but the rotation is relatively slow and the cows can step off the rotating platform 22 without much difficulty.

For purposes of this application the term "clean" or "cleaning" shall be referred to as any sanitizing, spraying, or killing bacteria or remove debris on an udder surface. This includes spraying iodine or other chemical agents in liquid or powder form on to the udder.

The general operation of the cow udder cleaning device 28 is as follows. Each stall 42 is defined by two posts 44 at the perimeter of the platform 44 and radially aligned horizontal bars 45. When the platform 22 rotates, each vertical post 44 will come into contact with contact sensor 56 (to be described later) which indicates that a stall 42 is in proper position for the udder cleaning device 28 to operate. Next optical sensor 58 (also described later) detects whether a cow is occupying stall 42, and if there is a cow present an arm 46 is repositioned in-between the cow's hind legs and disinfectant is discharged from nozzle 47. Then the swing arm 46 is retracted.

There will now be a detailed description of the cow udder cleaning device 28 followed by a more detailed description of the operations of the same.

The cow udder cleaning device 28 is shown in detail in FIGS. 2–4. The main components are a vertical mounting plate 48, a sensor system 50, a processor (or control system or solenoid processor) 52, and a positioning system 54.

The mounting plate 48 is rigidly attached to the perimeter railing 26 which is stationary. The mounting plate 48 functions as a base plate to which all the key components of the cow udder cleaning system 28 are mounted thereon.

In the preferred embodiment the sensor system 50 comprises two sensors, a contact sensor 56 and an optical sensor 58. Both of the sensors provide data input to the processor 52. The contact sensor 56 comprises a sensing contact member 59 which comprises a vertical stem portion 60 that extends upwardly from the upper part of the mounting plate 48, and has an upper end 62 and a base end 64 by which it is mounted for limited rotation about its vertical axis. A horizontal arm 66 is connected by it base end 70 to the upper end 62 of the vertical stem portion 60, and comprises a radially inward swing end 68, a base end 70 and a contact surface 72. The contact sensor 56 further comprises a sensor 74 connected to the base end 64 of the vertical stem 60. The sensor 74 is responsive to rotation of the vertical stem 60. When the contact surface 72 of the horizontal arm 66 is engaged by one of the posts 44, the arm rotates to rotate the vertical stem 60 to cause the sensor 74 will send a signal to indicate that one of the stalls 42 has arrived at its disinfecting location.

In the preferred form, the second sensor 58 is an optical sensor with a function to detect if a cow is located in a stall. The optical sensor 58 emits electromagnetic radiation in the non-visible frequency range and the sensor 58 will detect rebounding electromagnetic waves. Of course, other dis-

US 6,443,094 B1

5

tance measure sensors that detect if an object is present within a certain distance could be employed. The sensor **58** will also send its data to processor **52** for data analysis.

Thus, when the contact sensor **56** and the optical sensor **58** provide the signals that the stall **42** is in the operating position and a cow is present, the processor **52** initiates the disinfecting process.

The operating or positioning system **54** has a primary function to place the swing arm **46** in its disinfecting position as shown in FIG. **4** in between a cow's legs and to cause the iodine (or other cow udder cleaning fluid) to be discharged through the nozzle **47** in a vertical direction on cow's udder.

In the preferred form, the positioning system **54** comprises the aforementioned swing arm **46**, an actuator (actuating mechanism) **78**, and a dispersion portion **80** comprising the nozzle **47**. The swing arm **46** comprises a vertical arm portion **82**, an upper portion **84**, a middle portion **86** and a lower portion **88**. The swing arm **46** further comprises a horizontal arm member **90** that is located in the lower portion **88** and a vertical member **92**. The upper portion **44** of the vertical arm portion **86** is pivotally connected at **100** to the upper part of the mounting plate **48**, so as to be able to rotate radially inward and outwardly. The radially inward and outward motion is referred to the path of travel of the swing arm **47** shown as dashed line **53**. The path of travel **53** of the swing arm (or extension arm) **47** has an inward portion (or cleaning position or dispersion position) **55** that is substantially below the cow's udder and a withdrawn position (or retracted position) **57** that is radially outward from the stall **42** and clear from any rotating member of the plate **22** such as the posts **43**. The cleaning position or dispersion position is any location along the path of travel of the extension arm from the retracted position to the cleaning position where the dispersion portion can adequately spray material onto the cow's udder. An extension **102** is fixedly connected in the middle portion **86** of the vertical member **82** and extends radially outward therefrom and comprises a base connecting portion **104** and an outer portion **106**. A pivot means **108** is located at the outer portion **106** and is attached to the actuating member **78**.

The horizontal member (extension arm) **90** which is located at the lower portion **88** of the vertical arm portion **88**, comprises a base end **109**, and inward end (fluid dispensing portion) **110**, a lower portion **112** and an upper portion **114**. The horizontal member **90** is preferably made from a flexible material to withstand the potential abuse from the cow's hooves. The horizontal member **90** should also be relatively thin in the tangential direction so that it can more easily slip in between the cow's hind legs.

The dispersion portion (cleaning fluid dispensing portion) **80** is located at the inward end **110** of the horizontal member **90**, and (as indicated previously comprises the vertically mounted nozzle **47**. The nozzle **47** is in communication with a disinfectant section which comprises a disinfectant source connected to the nozzle **47** by a hose or disinfectant line (indicated by the broken line **116**) which holds disinfectant fluid (such as iodine) and is adapted to disburse this disinfectant fluid in a fanlike or expanding spray like manner as shown in FIG. **4**.

The actuator (actuating system) **78** comprises a cylinder portion **118** and a piston rod **120**. The actuator can be driven by a hydraulic fluid or gas. When the actuator is in the position as shown in FIG. **2** the internal cylinder is pressurized and the force exerted on the piston rod **120** moves the swing arm **46** radially outwardly to the position of FIG. **2**.

6

When the pressure is released within the actuator **78** the swing arm **46** will rotate about pivot location **100** radially inwardly to a position shown in FIG. **4**. Alternatively actuator **78** could have an internal spring which biases the piston rod **120** to the position shown in FIG. **2**, and when pressure is applied to the cylinder within the actuator **78** the piston rod **120** will retract to within the cylinder portion **118** and hence move the swing arm **46** radially inwardly to the position shown in FIG. **4**. In the preferred embodiment the former arrangement of the actuator **78** is employed.

There will now be a more detailed discussion of the operation of the cow udder cleaning apparatus **28**. As mentioned earlier, the cow udder cleaning apparatus **28** is located in the udder cleaning location **38** of the milking parlor **20**, and it is the final stage of the milking operation. It should be noted that the milking operation is essentially a continuous one, meaning the rotating platform **22** continuously rotates and the cows **24** continuously enter onto and exit from the rotating platform **22**. It should be noted that the apparatus could be used before the milking operation begins and the apparatus of the present invention could be located an a variety of locations around the rotating platform **22**.

We will now describe the cow udder cleaning apparatus when a single stall **42** is rotating to the cleaning location in front of the cow udder cleaning apparatus **28**. As shown in FIG. **3**, when this stall **42** moves clockwise, as seen in FIG. **2**, the contact surface **72** of the contact sensor **56** comes in contact with the vertical post **43a** (or other member in proximity to the stall **42**. It should be noted, that in FIG. **3** the perimeter railing **26** and the mounting plate or structure (base platform) **48** attached thereon are stationary, and the rotating plate **22** and vertical bars **43** our rotating and hence moving to the left at a relatively slow speed of 0.2 to 0.9 mph.

Now to return to the discussion of the operation of the cow udder cleaning apparatus **28**, when the contact member **59** is rotated about the vertical stem portion **60** of the same, the sensor **74** passes this information to the processor **52**. The next step is that the processor **52** will now take a reading from the optical sensor **58** to detect if a cow is present in the stall **42** at the cleaning location (operating location). As shown in FIG. **3**, if there is not a cow in the stall **42**, the sensor **58** would detect the lack of a presence of a cow in the stall **42** and relay this back to the processor **52**. Then the processor **52** will take no action for the positioning system (cleaning section) **54** and will be ready for the next signal sent from the contact sensor **60** which would indicate the next stall is in position. Of course the cleaning or sanitizing operation could take place without the optical sensor **58**; however, the spraying action would take place regardless if a cow is present in the stall or not.

Now we will discuss the operation of the cow udder cleaning operation where instead the stall **42** being empty, there is a cow located therein as shown in FIGS. **2** and **4**. Now after the contact sensors **60** comes in contact with vertical post **43a** and delivers a signal to processor **52**, the processor **52** will then get a reading from optical sensor **58** which will indicate the presence of a cow in the stall **42** as shown in FIG. **2**. The next step of the processor **52** is to reduce the pressure that is supplied to the actuator **78**. As mentioned before, the actuator **78** has a bleed line which allows a small amount of fluid or gas to escape from its internal cylinder. This allows for a slow steady swing of the swing arm **46** so the swing arm will pivot about pivot portion **100** to a position shown in FIG. **4**.

As the swing arm **46** is rotating slowly into the cleaning position of FIG. **4**, the processor **52** takes an additional step

US 6,443,094 B1

7

of providing pressure to the disinfectant line 116 (shown in FIG. 2 only) that is in communication with the nozzle 47. The disinfectant line is in communication with the disinfectant source (i.e. a storage tank which is not shown), that holds a supply of disinfectant which is generally iodine. When the disinfectant line is pressurized, disinfectant will be emitted from nozzle 47. Therefore as the swing arm 46 moves the horizontal member 90 in between the cow's hind legs the nozzle 47 is spraying the disinfectant which covers the cow's udder from rear to front. When the swing arm 46 is in the position shown in FIG. 4, the actuator 78 is pressurized and the piston rod 120 will extend radially outwardly and begin to rotate swing arm 46 back to the position shown in FIG. 2. While the swing arm is being withdrawn from in between the cow's hind legs, pressure to the disinfectant line is maintained and the nozzle 116 will spray a second coat of disinfectant on the cow's udder as the horizontal member 90 withdraws. When the swing arm 46 is near the position as shown in FIG. 2, the processor 52 cuts the pressure to the disinfectant line and the nozzle 47 ceases to emit disinfectant. At this point the processor 52 is ready to receive a signal from the contact sensor 56 when the next stall is in the cleaning location.

The nozzle 47 could further emit a powder substance that is mixed in with compressed air so that when the compressed air flows through the disinfectant line (not shown), the powder material will emit in a vertical direction on the cow's udder. Compressed air could also be used with a cleaning or disinfecting liquid such as iodine so that the dispersion pattern and concentrations of iodine are more desirable.

Although two sensors are employed in the present invention, the important aspect of the sensing system 50 is that it can detect the presence and location of a cow so that the extension arm's 90 path of travel will be guided through the cow's hind legs.

FIG. 5 discloses a second embodiment which is substantially similar to the first embodiment except instead of having pivot portion 100 in a position above the horizontal member 90, the pivot portion 117 is positioned onto a fixed a mounting structure 118. The arm 120 comprises a first portion 122 and an upper portion 124 (extension arm). Located at the radially inward portion of upper portion 124 is a nozzle extension (fluid extension) 126 which is in communication with a pressure line which interns in communication with a supply of disinfectant. The actuator 128 operates a substantially similar manner as the actuator 78 in the first embodiment.

FIG. 6 shows a third embodiment where the apparatus of the present invention 150 comprises a control unit 152, an actuating member 154, and an extension arm 156. The control unit 152 comprises a processor, a sensing system, and a switch. The operation of the third embodiment is substantially similar to the previous embodiments. The sensing system is designed to detect a certain amount of radial rotation of the rotating plate 22. Of course there are a number of ways of accomplishing this. For example, there could be an assortment of indicating marks which have a radial distance between them to correspond to the radial width of a stall. The sensing system would detect the rotation of an indicating mark which would indicate a stall is in position for the cleaning process to occur. Further, a rotational sensing transducer could be employed to indicate a certain amount of rotation of the rotating plate 22 and this information could be transmitted to the processor of the control unit 152. It is advantageous to use a cow detecting sensor in addition to a rotational sensor so to prevent the nozzle from disbursing disinfectant fluid into the air when a cow is not present in the stall.

8

The actuating systems 154 could be accomplished by a variety of methods such as but not limited to pneumatic cylinders, hydraulic cylinders, electromagnetic force, IC engine, etc. the important aspect of the actuating means is that it positions the dispersion portion 158 relatively quickly underneath the cow's udder and is withdrawn relatively quickly. Acceptable times to complete that operation would be in the ranges of 0.2 seconds to 1.25 seconds.

The extension arm 156 has a dispersion portion 158 where a nozzle 160 is located. It is desirable to have the extension arm relatively thin in the tangential direction so as it can easily be positioned between the hind legs of the cow.

FIG. 7 shows a fourth embodiment where the apparatus of the present invention is positioned in the center portion in a circular herringbone parlor. The apparatus 200 is similar to the previous embodiments; however, the extension arm 202 travels substantially in a horizontal plane to have the dispersion section 204 to be in the fully inserted cleaning position as shown by the hatched line of extension arm 202.

The cows 206 in FIG. 7 have an open portion 208 exposed that allows access for the extension arm to 202 to extend thereunder. By placing the base platform 209 in the center portion of the rotating plate 210, the apparatus 200 can take advantage of the open portion defined by hatched lines 212 and 214 to get access to the cleaning position which is located under the cows udder when the cow 206a is in the cleaning position as seen in FIG. 7.

As in the previous embodiments the apparatus 200 would have a rotational sensing system and actuator to position the arm 202.

FIG. 8 shows a fifth embodiment of the present invention where the apparatus's swing arm or cleaning section 220 pivots in the substantial horizontal plane about point 222. As seen in FIG. 8, the swing arm 220 is in a retracted position as indicated by the solid lines. When the swing arm is in a cleaning position where the nozzle 224 is positioned substantially underneath the cow's udder.

FIG. 9 illustrates a sixth embodiment where the apparatus's swing arm or cleaning section 230 pivots in the substantial horizontal plane about point 232. The swing arm 230 is in a retracted position as indicated by the solid line, and in a cleaning position as indicated by the broken line. When in a cleaning position the nozzle 230 for a positioned substantially underneath the udder of the cow.

The fifth and six embodiments of course have an actuating system to position the cleaning section in a cleaning position and in a retracted position. Further, a sensor is employed to detect the rotational position of the plate the cows are standing on.

The important aspects of the invention is the ability to position a dispensing portion of an extension arm into a cleaning or dispersion position underneath the cow's udder so the dispensing portion can disburse fluid or powder thereon the cow's udder.

While the invention is susceptible of various modifications and alternative forms, specific embodiments thereof have been shown by way of example in the drawings as herein described in detail. It s should be understood, however, that it is not intended to limit the invention to the particular forms disclosed, but, on the contrary, the intention is to cover all modifications, equivalents and alternatives falling within the spirit and scope of the invention as expressed in the appended claims.

I claim:

1. A system for cleaning udders of cows in a milking parlor, where there is a plurality of milking stalls arranged

US 6,443,094 B1

**9**

on a moving platform to move through a milking cycle, and said parlor comprises a milk extracting region where milking machines extract milk, and an exit location, said system comprising:

   a) an udder cleaning apparatus positioned at a cleaning location intermediate the milk extracting location and the exit location, with said stalls passing by said cleaning location, said cleaning apparatus comprising:

    i) a mounting structure at the cleaning location;

    ii) a cleaning section which is movable between a retracted position which is out of a path of travel of the stalls and a cleaning position when the cleaning section discharges cleaning fluid to clean an udder of the cow which is in a stall which is at the cleaning location;

   b) a control section comprising a location sensor responsive to location of the stalls and to provide signals identifying arrival times at which each of the stalls is at the cleaning location, said control section being arranged to cause the cleaning section to move, relative to the arrival times, from the retracted position to the cleaning position to discharge said cleaning fluid toward the udder of the cow, then to retract the cleaning section form the cleaning position to complete a cleaning cycle, and when the stall in the cleaning location moves from the cleaning location, to again cause the cleaning section to move to the cleaning position to initiate a subsequent cleaning cycle as a following stall is arriving at the cleaning location.

  **2**. The system as recited in claim **1**, wherein said control section further comprises a presence detector to detect the presence of a cow in a stall which is at the cleaning location.

  **3**. The system as recited in claim **2**, whereas said presence detector comprises an electromagnetic detector which

**10**

directs an electromagnetic wave toward the stall at the cleaning location and responds to the electromagnetic wave encountering a cow in the stall at the cleaning location to permit the cleaning cycle to take place.

  **4**. The system as recited in claim **1**, wherein said location sensor responds to location elements which are arranged to move synchronously with said moving platform and are at spaced locations corresponding to spacing of said stalls.

  **5**. The system as recited in claim **4**, whereas said location sensor is a contact sensor and said location elements are arranged to come into contact with said location sensor as said platform moves.

  **6**. The system as recited in claim **5**, wherein said location elements are physical components of the milking parlor which move sequentially into engagement with the location sensor during movement of the platform.

  **7**. The system as recited in claim **1**, wherein said cleaning section comprises an extension arm on which a cleaning fluid dispensing portion is positioned, and said extension arm moves on a path of travel from the retracted position to the cleaning position where at least a portion of said extension arm is beneath the cow which is in the stall in the cleaning location.

  **8**. The system as recited in claim **7**, wherein said extension arm is arranged so that the path of travel extends between two legs of the cow.

  **9**. The system as recited in claim **8**, wherein said path of travel extends between two hind legs of the cow.

  **10**. The system as recited in claim **8**, wherein said extension arm is arranged so that the path of travel extends between a front leg and a hind leg of the cow.

\* \* \* \* \*



US006443094C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (8808th)

# United States Patent
DeWaard

(10) **Number:** US 6,443,094 C1
(45) **Certificate Issued:** Jan. 17, 2012

(54) **METHOD AND APPARATUS FOR CLEANING THE UDDER OF A COW**

(75) Inventor: **Dave DeWaard**, Lynden, WA (US)

(73) Assignee: **Daritech, Inc.**, Lynden, WA (US)

**Reexamination Request:**
No. 90/011,755, Jun. 29, 2011

**Reexamination Certificate for:**
Patent No.: **6,443,094**
Issued: **Sep. 3, 2002**
Appl. No.: **09/698,433**
Filed: **Oct. 25, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/170,153, filed on Dec. 10, 1999.

(51) **Int. Cl.**
*A01J 5/00* (2006.01)
*A01J 3/00* (2006.01)

(52) **U.S. Cl.** .................................................... 119/14.18

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,755, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Beverly M. Flanagan

(57) **ABSTRACT**

A method apparatus for teat dipping for sanitizing the udder of a cow either before or after milking. The apparatus has an extension arm with a dispersion portion so that when a cow is in a cleaning location the extension arm will extend underneath a cow's udder and dispersed cleaning fluid onto the cow's udder. A sensing system is used that detects the rotation of the parlor to determine if a cow is at a cleaning location. Further, the sensing system detects whether a cow is present in a stall of the rotary milking parlor.



US 6,443,094 C1

**1**

**EX PARTE
REEXAMINATION CERTIFICATE
ISSUED UNDER 35 U.S.C. 307**

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1-10** is confirmed.

\*  \*  \*  \*  \*



US006443094C2

(12) **EX PARTE REEXAMINATION CERTIFICATE** (9724th)

# United States Patent
DeWaard

(10) **Number:** US 6,443,094 C2
(45) **Certificate Issued:** Jun. 26, 2013

(54) **METHOD AND APPARATUS FOR CLEANING THE UDDER OF A COW**

(75) Inventor: **Dave DeWaard**, Lynden, WA (US)

(73) Assignee: **Daritech, Inc.**, Lynden, WA (US)

**Reexamination Request:**
No. 90/012,285, May 8, 2012

**Reexamination Certificate for:**
Patent No.: **6,443,094**
Issued: **Sep. 3, 2002**
Appl. No.: **09/698,433**
Filed: **Oct. 25, 2000**

Reexamination Certificate C1 6,443,094 issued Jan. 17, 2012

**Related U.S. Application Data**

(60) Provisional application No. 60/170,153, filed on Dec. 10, 1999.

(51) **Int. Cl.**
| | |
|---|---|
| *A01J 5/00* | (2006.01) |
| *A01J 7/04* | (2006.01) |
| *A01J 5/17* | (2006.01) |
| *A02J 7/00* | (2006.01) |

(52) **U.S. Cl.**
USPC ...................................................... 119/14.18

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/012,285, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Jeffrey L. Gellner

(57) **ABSTRACT**

A method apparatus for teat dipping for sanitizing the udder of a cow either before or after milking. The apparatus has an extension arm with a dispersion portion so that when a cow is in a cleaning location the extension arm will extend underneath a cow's udder and dispersed cleaning fluid onto the cow's udder. A sensing system is used that detects the rotation of the parlor to determine if a cow is at a cleaning location. Further, the sensing system detects whether a cow is present in a stall of the rotary milking parlor.



US 6,443,094 C2

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claim **1** is determined to be patentable as amended.

Claims **2-10**, dependent on an amended claim, are determined to be patentable.

**1**. A system for cleaning udders of cows in a milking parlor, where there is a plurality of milking stalls arranged on a moving platform to move through a milking cycle, and said parlor comprises a milk extracting [region] *location* where milking machines extract milk, and an exit location, said system comprising:

**2**

a) an udder cleaning apparatus positioned at a cleaning location intermediate the milk extracting location and the exit location, with said stalls passing by said cleaning location, said cleaning apparatus comprising:
  i) a mounting structure at the cleaning location;
  ii) a cleaning section which is movable between a retracted position which is out of a path of travel of the stalls and a cleaning position when the cleaning section discharges cleaning fluid to clean an udder of the cow which is in [a stall] *one of said stalls* which is at the cleaning location;
b) a control section comprising a location sensor responsive to location of the stalls and to provide signals identifying arrival times at which each of the stalls is at the cleaning location, said control section being arranged to cause the cleaning section to move, relative to the arrival times, from the retracted position to the cleaning position to discharge said cleaning fluid toward the udder of the cow, then to retract the cleaning section from the cleaning position to complete a cleaning cycle, and when the stall in the cleaning location moves from the cleaning location, to again cause the cleaning section to move to the cleaning position to initiate a subsequent cleaning cycle as a following stall is arriving at the cleaning location.

* * * * *

Trials@uspto.gov                                    Paper 13
Tel: 571-272-7822                        Entered: February 28, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

DELAVAL INTERNATIONAL AB
Petitioner

v.

LELY PATENT N.V.
Patent Owner

————————————

Case IPR2013-00575
Patent 6,443,094

————————————

Before BENJAMIN D. M. WOOD, SCOTT E. KAMHOLZ, and
ADAM V. FLOYD, *Administrative Patent Judges.*

FLOYD, *Administrative Patent Judge.*


DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2013-00575
Patent 6,443,094

## I. BACKGROUND

Pursuant to 35 U.S.C. § 311, DeLaval International AB ("Petitioner") filed a petition to institute an *inter partes* review of claims 1-10 (the "challenged claims") of U.S. Patent No. 6,443,094 B1 (Ex. 1001, "the '094 patent"). Paper 1 ("Pet."). Lely Patent N.V. ("Patent Owner") filed a Preliminary Response. Paper 11 ("Prelim. Resp."). Upon consideration of the information presented in the Petition and the Preliminary Response, we determine that Petitioner has shown, under 35 U.S.C. § 314(a), a reasonable likelihood that it would prevail with respect to at least one of the challenged claims.

The '094 Patent was involved in district court litigation, *Daritech, Inc. v. Green Source Automation*, *LLC*, Case No. 1:11-cv-156 (C.D. Cal. Jan. 27, 2011) which has settled. Supplemental Mandatory Disclosure (Paper 10). In addition, the '094 patent was involved in two ex parte reexaminations (Control Nos. 90/011,755 and 90/012,285), both of which have been completed. *Id.*

### A. The '094 Patent (Ex. 1001)

The '094 patent generally relates to an apparatus for automatically sanitizing the udder of a cow, after it has been milked. Ex. 1001, Abstract. After a cow is milked, its udder is cleaned with a disinfectant to prevent infection. This was traditionally done by a person using a spraying device. *Id.* at col. 1, ll. 15-23.

2

Case IPR2013-00575
Patent 6,443,094

Figure 1 of the '094 patent is reproduced below:



Figure 1 depicts a milking parlor containing an automated sanitizing system. The milking parlor contains rotating platform 22 comprised of stalls 42 which hold cows 24. Cow 24 enters at entry location 30, and a milking operator washes the udder of cow 24 and attaches a claw upon the cow's udder at claw attachment location 32. In automated fashion, milk is extracted from cow 24 at milking location 34. At claw removal location 36, a device withdraws the claw from the cow's udder. Cow 24 is then moved to the udder cleaning location 38, via rotating platform 22, and cleaning device 28 sprays the cow's udder with disinfectant. The cow then backs out of stall 42 at exit location 40. Platform 22 continuously rotates, at a relatively slow speed, which allows cows to step off the platform without much difficulty. The '094 patent explains that the milking parlor of Figure 1 is conventional, other than the addition of cleaning device 28 for automating the disinfecting of the cow's udders. *Id.* at col. 3, l. 47–col. 4, l. 14.

3

Case IPR2013-00575
Patent 6,443,094

Figures 2 and 4 of the '094 patent are reproduced below:



Figures 2 and 4 of the '094 patent show the relevant structural details of the automated disinfection assembly. Each stall is defined by two posts 43 at the perimeter of platform 22. As platform 22 rotates, each vertical post 43 will come into contact with contact sensor 56 (not shown), which indicates that a stall is in proper position for the udder cleaning device 28 to operate. An optical sensor 58 detects whether a cow is occupying stall 42, and if a cow is present, arm 46 is repositioned in-between the cow's hind legs and disinfectant is discharged from nozzle 47 (not depicted but part of dispersion portion 80). *Id.* at col. 4, ll. 20-31.

4

Case IPR2013-00575
Patent 6,443,094

*B. Exemplary Claim*

Claim 1 is the sole independent claim of the '094 patent at issue, and it recites:[1]

1.    A system for cleaning udders of cows in a milking parlor, where there is a plurality of milking stalls arranged on a moving platform to move through a milking cycle, and said parlor comprises a milk extracting location where milking machines extract milk, and an exit location, said system comprising:

    a) an udder cleaning apparatus positioned at a cleaning location intermediate the milk extracting location and the exit location, with said stalls passing by said cleaning location, said cleaning apparatus comprising:

    i) a mounting structure at the cleaning location;

    ii) a cleaning section which is movable between a retracted position which is out of a path of travel of the stalls and a cleaning position when the cleaning section discharges cleaning fluid to clean an udder of the cow which is in one of said stalls which is at the cleaning location;

    b) a control section comprising a location sensor responsive to location of the stalls and to provide signals identifying arrival times at which each of the stalls is at the cleaning location, said control section being arranged to cause the cleaning section to move, relative to the arrival times, from the retracted position to the cleaning position to discharge said cleaning fluid toward the udder of the cow, then to retract the cleaning section from the cleaning position to complete a cleaning cycle, and when the stall in the cleaning location moves from the cleaning location, to again cause the cleaning section to move to the cleaning position to initiate a subsequent cleaning cycle as a following stall is arriving at the cleaning location.

-----

[1] Claim 1 was amended during an *ex parte* reexamination proceeding.  Reexam. Cert. (Jun. 26, 2013), col. 1, l. 21–col. 2, l. 25.

Case IPR2013-00575
Patent 6,443,094

*C. The Prior Art*

Petitioner relies upon the following prior art references:

British Patent 1,415,318, published November 26, 1975 (Ex. 1002)

("Rose");

British Patent 1,398,596, published June 25, 1975 (Ex. 1004) ("Chandler");

PCT Patent Application WO 97/15183, published May 1, 1997 (Ex. 1005)

("Ornerfors");

PCT Patent Application WO 99/01026, published January 14, 1999

(Ex. 1006) ("Hall");

US 3,765,373, issued October 16, 1973 (Ex. 1007) ("Phillips");

PCT Patent Application WO 97/37530, published October 16, 1997

(Ex. 1008) ("van der Lely");

*The Australian Dairyfarmer*, July-August 1999, p. 4 (Ex. 1009); and

*The Australian Dairyfarmer*, September-October 1999, p. 41 (Ex. 1010)

(Exs. 1009 and 1010 referred to collectively as "Robex").

*D. Evidence*

Additionally, Petitioner relies upon the declaration of Mr. Jonathan Cagan

(Ex. 1011) ("Cagan Decl.").

6

Case IPR2013-00575
Patent 6,443,094

### E. The Asserted Grounds

Petitioner contends that the challenged claims are unpatentable under

35 U.S.C. §§ 102 and 103 based on the following specific grounds (Pet. 9-11):

| References | Basis | Claims challenged |
|---|---|---|
| Rose | § 102 | 1 and 4-9 |
| Rose and Chandler[2] | § 103 | 1 and 4-9 |
| Rose, Chandler, and Ornerfors | § 103 | 2 and 3 |
| Rose, Chandler, and Hall | § 103 | 2 and 3 |
| Rose, Chandler, and Phillips or van der Lely | § 103 | 10 |
| Robex | § 102 | 1, 2, and 7-10 |
| Robex, Rose, and Chandler | § 103 | 1 and 4-9 |
| Robex, Rose, Chandler, and Ornerfors or Hall | § 103 | 2 and 3 |
| Robex, Rose, Chandler, and Phillips or van der Lely | § 103 | 10 |

### F. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are given their

broadest reasonable construction in light of the specification of the patent in which

they appear.  37 C.F.R. § 42.100(b).  Under the broadest reasonable construction

standard, claim terms are given their ordinary and customary meaning as would be

---

[2] Petitioner asserts that claims 1 and 4-9 are unpatentable over Rose and Chandler.
Pet. 23-25.  Petitioner also asserts that claims 1 and 4-9 are unpatentable over
Chandler and Rose.  Pet. 26-36.  We address these two grounds, as one.

7

Case IPR2013-00575
Patent 6,443,094

understood by one of ordinary skill in the art at the time of the invention. *In re Translogic Tech., Inc.,* 504 F.3d 1249, 1257 (Fed. Cir. 2007).

Petitioner proposes an express construction for the phrase "a plurality of milking stalls arranged on a moving platform," recited in the preamble of independent claim 1, as well as for "electromagnetic radiation." Pet. 7-9. In ruling on the Petition, however, we determine that it is unnecessary to construe expressly either of those claim phrases.

We determine, however, that construction is necessary for the phrases "stalls passing by said cleaning location," and "when the stall in the cleaning location moves from the cleaning location," as Patent Owner asserts that Rose fails to disclose the two claim limitations. Prelim. Resp. 1-14.

### 1. *"stalls passing by said cleaning location"*

Claim 1 recites, "an udder cleaning apparatus positioned at a cleaning location intermediate the milk extracting location and the exit location, with said stalls passing by said cleaning location." Patent Owner asserts that "stalls passing by said cleaning location" requires the milking parlor platform rotate *continuously,* as opposed to intermittently (e.g., pausing at each station). Prelim. Resp. 1. However, nothing in the plain language of element (a) of claim 1 requires that the platform must move continuously. Thus, the plain language would appear to be satisfied whether the platform moves continuously or intermittently past the cleaning location.

We next turn to the specification which, as Patent Owner points out, discloses that in the preferred embodiment, platform 22 rotates continuously. *Id.* at 3 (*citing* Ex. 1001, col. 4, ll. 12-14). However, the Patent Owner does not adequately explain how the specification defines "stalls passing by said cleaning location" as being limited to a particular embodiment. "Though understanding the

8

Case IPR2013-00575
Patent 6,443,094

claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citing *Electro Med. Sys. S.A. v. Cooper Life Sci., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994)). Here, the language of claim 1 is clearly broader than the embodiment disclosed, as the plain language is not limited to continuous rotation.

Lastly, we look to the prosecution history of record. Patent Owner relies upon two Notices of Intent to Issue Ex Parte Reexamination Certificate, dated November 15, 2011 and May 31, 2013. Exs. 2003 ("1st Reexam Notice") and 2002 ("2d Reexam Notice"). Patent Owner asserts that "the Examiner required amendment of Claim 1 to clarify that all of the stalls were in continuous motion." Prelim. Resp. 1. Similarly, Patent Owner asserts that the Examiner "determined that Claim 1 must be interpreted to require continuous motion" (*id.* at 2), and that "the Examiner was clear that the movement of the carousel was central to the patentability of [claim 1]" (*id.* at 4). Nothing in the two Notices supports Patent Owner's positions.[3]

As to Patent Owner's assertion that the Examiner required amendment of Claim 1 to clarify that the stalls were in continuous motion, neither Notice presents statements of the Examiner with regard to any claim amendments. Moreover, from the two Ex Parte Reexamination Certificates, it appears that no claim amendments were made during the first reexamination, and that the amendments made during the second reexamination do not relate to the motion of the stalls. Ex. 1001,

---

[3] The Patent Owner provides a quotation from the Examiner that is supposedly associated with the 2nd Reexam Notice, but does not appear to be of record. Prelim. Resp. 3. Therefore, we decline to consider it. We note that the "statement of reasons for patentability and/or confirmation" alluded to in box 3 of the 2nd Reexam Notice was not included in Exhibit 2002.

Case IPR2013-00575
Patent 6,443,094

Reexam. Cert. (Jan. 17, 2012), col. 1, ll. 6-7; Reexam. Cert. (Jun. 26, 2013), col. 1,

l. 21–col. 2, l. 25.

Nor does the record bear out Patent Owner's assertions that the Examiner

determined that claim 1 requires continuous motion and that the movement was

central to the patentability of claim 1. In the 1st Reexam Notice, the Examiner

states the following reasons for patentability:

> As explained by van der Lely, the computer determines the estimated
> milking time or estimated residence time and then determines when
> the carousel rotates (see page 6 of patent owner's response filed
> 10/6/11, citing to van der Lely). In contrast, the rotation of the
> carousel of the instant invention is based upon a location sensor that is
> responsive to the location of the stalls. As recited in independent
> claim 1, the control section "provide(s) signals identifying the arrival
> times at which each of the stalls is at the cleaning location . . . (and is)
> arranged to cause the cleaning section to move, relative to the arrival
> times." Other cited prior art, Stein and Andersson, teach location
> sensor, but these sensors are for identifying parts of the cow's body
> (such as the teats), not the arrival of a stall. The examiner also agrees
> that Crosby, another cited reference, teaches a stepper motor that is
> controlled to step in discrete steps from position to position and has no
> need for sensors to determine the position of the carousel (see page 12
> of patent owner's response filed October 6, 2011). Accordingly, the
> rejections are withdrawn and claims 1-10 are confirmed.

Ex. 2003, 2-3. Thus, the Examiner found van der Lely differed from claim 1 in

that it did not use a location sensor to trigger the cleaning section to move, but

rather used a timer. The Examiner, likewise, found Stein and Andersson also

lacked a sensor for determining the location of a stall. Lastly, the Examiner found

that Crosby lacked sensors altogether. Nowhere does Examiner state or suggest

that claim 1 differs from the prior art because they do not disclose a continuously

rotating platform. Likewise, the 2d Reexam Notice provides no support to Patent

Owner's position, as it contains no discussion regarding the movement of the

10

Case IPR2013-00575
Patent 6,443,094

platform. *See* Ex. 2002. Therefore, the prosecution history does not support Patent Owner's contention that the phrase "stalls passing by said cleaning location" in claim 1 requires the platform to rotate continuously.

Thus, for the purposes of this Decision, we construe "stalls passing by said cleaning location" according to its ordinary and customary meaning and not to require continuous rotation of the stalls.

### 2. *"when the stall in the cleaning location moves from the cleaning location"*

Patent Owner asserts that the plain language of claim 1 requires the cleaning section be retracted when the location sensor indicates that the stall is leaving the cleaning location (i.e., the retraction is triggered by the location sensor or location of the stall). Prelim. Resp. 10.

Claim 1 requires that a location sensor provides a signal identifying the arrival time of each stall, as it arrives to the cleaning location. It then recites, "control section being arranged to cause the cleaning section to move, relative to the arrival times, from the retracted position to the cleaning position to discharge said cleaning fluid toward the udder of the cow, then to retract the cleaning section from the cleaning position to complete a cleaning cycle." In other words, the cleaning section moves to the cleaning position based upon the arrival time, discharges the cleaning fluid, and retracts.

Patent Owner asserts that the last phrase of claim 1, namely, "when the stall in the cleaning location moves from the cleaning location," requires the retraction of cleaning section be triggered by the location sensor. *Id.* at 8-12. Patent Owner takes the phrase out of context. The full phrase reads, "and when the stall in the cleaning location moves from the cleaning location, to again cause the cleaning section to move to the cleaning position to initiate a subsequent cleaning cycle as a

11

following stall is arriving at the cleaning location." As discussed above, prior to the claim phrase "when the stall in the cleaning location moves from the cleaning location," claim 1 requires the cleaning section move to the cleaning position based upon the arrival time provided by the location sensor, then discharge cleaning fluid and retract. Once the stall has cleared the cleaning location, another stall arrives, and the cycle begins again. Thus, the claim language is contrary to Patent Owner's position because the retraction step occurs prior to the cleaning section leaving the cleaning position.

We next turn to the specification. The disclosed embodiments do not base the retraction step on receipt of a "location sensor-generated signal indicating movement of the stall from the cleaning location," as Patent Owner asserts. Prelim. Resp. 11. In fact, the plain language of claim 1 tracks the embodiments disclosed. For example, the specification describes the general operation of cleaning device 28 as follows:

> When the platform 22 rotates, each vertical post [43][4] will come into contact with contact sensor 56 . . . which indicates that a stall 42 is in proper position for the udder cleaning device 28 to operate. Next optical sensor 58 (also described later) detects whether a cow is occupying stall 42, and if there is a cow present an arm 46 is repositioned in-between the cow's hind legs and disinfectant is discharged from nozzle 47. Then the swing arm 46 is retracted.

Ex. 1001, col. 4, ll. 23-31. Thus, the contact or location sensor[5] begins the cycle but does not trigger the retraction step.

---

[4] The Specification erroneously references 44 instead of 43.

[5] The phrase, "location sensor" does not appear in the specification. However, the contact sensor 56 is the only sensor disclosed which relates to the location of the platform. *See e.g.,* Ex. 1001, col. 4, ll. 44-62.

12

Case IPR2013-00575
Patent 6,443,094

Similarly, under the more detailed discussion of the operation of cleaning apparatus 28, the specification indicates that the location sensor begins the cleaning cycle by sending a signal identifying the arrival time[6] of the stall. The remaining steps of discharging disinfectant and retracting the cleaning section are not based upon the location sensor or the location of the platform. Ex. 1001, col. 6, l. 55–col. 7, l. 22.

Lastly, nothing in the prosecution history of record sheds light on the claim construction at hand.

Thus, for the purposes of this Decision, we construe "and when the stall in the cleaning location moves from the cleaning location, to again cause the cleaning section to move to the cleaning position to initiate a subsequent cleaning cycle as a following stall is arriving at the cleaning location" to mean that once the cleaning cycle is complete, and the stall has moved from the cleaning location, a subsequent cleaning cycle begins with the arrival of the following stall, and the cleaning section is again moved into the cleaning position. The claim limitation does not require the retraction of the cleaning section be triggered by the location of the platform or the location sensor. In fact, nothing in claim element (b) of claim 1 requires anything be triggered from the location sensor, other than the initiation of the cleaning cycle, which begins with the arrival of a stall into the cleaning position.

---

[6] The phrase "arrival time" does not appear in the specification. As described, "arrival time" is not an actual time, but rather a signal to the processor announcing the arrival of the stall.

13

Case IPR2013-00575
Patent 6,443,094

## II. ANALYSIS

We now turn to Petitioner's asserted grounds of unpatentability and Patent Owner's arguments in its Preliminary Response to determine whether Petitioner has met the threshold standard of 35 U.S.C. § 314(a).

### A. Prior Art Relied Upon

#### 1. Rose (Ex. 1002)

Rose is a British patent relating to an automated spray device to wash cow udders, used in conjunction with a rotary-type, cow-milking apparatus. Ex. 1002, 1, ll. 9-41. The relevant structural details of the automated spray device may be understood by referencing Figure 1 of Rose, which is reproduced below.



Rose's apparatus for cleaning cow udders includes swing arm 10, pivotally mounted to rump rail 12 of a rotary-type milking apparatus, which further includes rotatable platform 13. *Id.* 1, ll. 69-75. Piston and cylinder device 15 is pivotally

14

Case IPR2013-00575
Patent 6,443,094

mounted to support 14, which extends from rump rail 12 and actuates swingable spray arm 23.  *Id.* at 1, ll. 78-83.

In operation, a cam on rotating platform 13 contacts actuating switch 33 of the spray device.  Then, vacuum control valve 17 causes spray arm 23 to pivot from a retracted position (indicated in dotted lines) to a cleaning position, between the hind legs of the cow standing on platform 13.  *Id.* at 2, ll. 25-39.  Spray nozzles 24 dispense a sanitizing liquid over the cow's udders.  *Id.* at 2, ll. 39-46.  After a period of time, determined by timing relay 32, solenoid 31 will be de-energized, actuating vacuum control valve 17, which causes piston and cylinder device 15 to pivot swing arm 10 back into the inoperative position.  *Id.* at 2, ll. 49-55.

Two spray devices may be provided on the rotary-type milking apparatus, one of which is located near the position where the cows exit platform 13.  *Id.* at 2, ll. 58-65.  Rose twice references UK Patent 1,398,596 (i.e., Chandler) as an example of a rotary-type milking apparatus suitable for use with Rose's automated spray device.  *Id.* at 1, ll. 75-78; 2, ll. 74-77.

### 2. Chandler (Ex. 1004)

Chandler is a British patent relating to an animal milking apparatus.  The animals are carried in stalls provided on a platform that rotates intermittently, each stop bringing one animal in line with an exit and another in line with an entry.  Each animal is milked automatically, during the time in which it takes the turntable to convey the animal from the point of entry to the point of exit.  Ex. 1004, 1, ll. 9-22.  The relevant operation of Chandler's milking apparatus may be understood by referencing Figure 1, which is reproduced below.

15

Case IPR2013-00575
Patent 6,443,094



Figure 1 depicts a rotating milking parlor.  When platform 10 is stationary, stall 12 is presented in line with entry 23, and a cow enters via a ramp.  Platform 10 is rotated, carrying the cow to the next station where operator No. 1 washes the cow's udders and applies teat cups 17.  As the platform continues to be rotated, the cow is automatically milked.  Eventually, the cow reaches operator No. 2 (*see* Fig. 9), who removes the teat cups.  With each stop of platform 10, another cow enters via entry bridge 23, while another exits via bridge 24.  *Id.* at 3, ll. 14-40.

Chandler discloses using cam members 57, mounted below stalls 12 on track 26, to engage stop/start switch 55, as platform 10 is rotated from one center of a stall to the next.  *Id.* at 2, ll. 60-67; *see* Fig. 4.

While the figures of Chandler depict the cows facing in toward the center of the platform hub, the specification indicates that stalls 12 may be arranged in a herringbone pattern, where the cows face outwardly.  *Id.* at 3, ll. 61-67.

### 3.  Ornerfors (Ex. 1005)

Ornerfors is a PCT patent application relating to a device for locating the

16

Case IPR2013-00575
Patent 6,443,094

teats of a cow.  Ex. 1005, 2, ll. 3-6.  One purpose disclosed for locating a cow's
teats, is to disinfect them after milking.  *Id.* at 12, ll. 16-24; Fig. 1d.  Ornerfors
discloses applying a position indicating means to the teats, such as ionized liquid,
which may then be sensed by an electric-charge sensing means.  *Id.* at 3, ll. 15-18.

### 4. Hall (Ex. 1006)

Hall is a PCT patent application relating to using sensors to monitor the
health and behavior of an animal, such as a cow.  Ex. 1006, 1, ll. 19-21.
Specifically, sensors may be used to monitor the movement and breathing of a
cow.  *Id.* at Abstract.  Hall discloses a variety of sensors, including laser,
ultrasonic, camera, and microphone.  *Id.* at 3, ll. 12-16.  Hall discloses using the
monitoring system in conjunction with an animal-related apparatus, such as an
automated milking apparatus which may include a teat spraying operation.  *Id.* at 3,
l. 28–4, l. 2.

### 5. Phillips (Ex. 1007)

Phillips is a U.S. patent relating to a rotatable milking apparatus for cows.
Ex. 1007, Abstract.  The cows are arranged in a herringbone pattern.  *See, id.* at
Fig. 1.

### 6. Van der Lely (Ex. 1008)

Van der Lely is a PCT patent application relating to a rotatable milking
apparatus with a variable speed of rotation.  Ex. 1008, Abstract; 1, l. 27–2, l. 2.  In
van der Lely, the cows are arranged about the periphery.  *See, e.g., id.* at Fig. 1.
The reference also discloses that the stalls may contain a detector (e.g., laser or
ultrasonic sensor) to locate the cow's teats.  *Id.* at 4, ll. 15-19.  The rotatable
milking apparatus includes a robotic arm for milking and cleaning the teats.
*Id.* at 5, ll. 31-32.

17

Case IPR2013-00575
Patent 6,443,094

### 7. *Robex (Exs. 1009 and 1010)*

Robex is a pair of advertisements, published in the July-August 1991 and September-October 1999 issues of The Australian Dairyfarmer. Exs. 1009 and 1010, respectively. Robex relates to a commercially-available automated spray device to wash cow udders, which may be used in conjunction with a rotary-type, cow milking apparatus.

### B. *Asserted Grounds Based on Rose*

#### 1. *Asserted anticipation—Claims 1 and 4-9*

Petitioner contends that all limitations of claims 1 and 4-9 are disclosed by Rose. However, Petitioner admits that Rose's figures do not explicitly depict a plurality of stalls, nor a plurality of cams mounted relative to each stall. Petitioner asserts that those features are implicitly disclosed in Rose, which is directed to use on a rotary milking platform holding multiple cows. Petitioner asserts that one of ordinary skill in the art would understand that Rose implicitly discloses a plurality of milking stalls and location elements. Pet. 15.

In addition, Petitioner points out that Rose twice references Chandler as a rotary milking apparatus useable with Rose's spray device. *Id*. at 16; *see also* Ex. 1002, 1, ll. 75-78 and 2, ll. 74-77. The reference to Chandler further supports Petitioner's contention that Rose implicitly discloses a plurality of stalls and a plurality of cams mounted relative to each stall.

Patent Owner asserts that Rose does not anticipate claim 1, because claim 1 requires the platform to continuously rotate while in operation. Prelim. Resp. 1-14. As discussed above, claim 1 does not require continuous rotation of the platform.

In addition, Patent Owner asserts that claim 1 requires that the cleaning section be retracted in synch with the continuously rotating platform—not based

18

Case IPR2013-00575
Patent 6,443,094

upon a timing circuit as disclosed in Rose. *Id*. at 5. As discussed above, claim 1 does not require a continuously rotating platform, nor does claim 1 require that the retraction step be triggered by the contact sensor or be based on the location of the platform.

Upon consideration of the parties' argument and evidence presently of record, we determine that Petitioner has demonstrated that there is a reasonable likelihood of prevailing on its challenge to the patentability of claims 1 and 4-9.

> 2. *Asserted obviousness based on Rose and Chandler—Claims 1 and 4-9*

Petitioner asserts that Chandler discloses a plurality of stalls and a plurality of cams mounted relative to each stall. Petitioner further asserts that it would have been obvious, to one of ordinary skill, to expand Rose's explicit disclosure of a single stall and single cam to a plurality of each, as disclosed in Chandler, as doing so would predictably further Rose's intended operation which involved a plurality of cows. Petitioner also notes that Rose expressly directs the skilled artisan to Chandler. Pet. 24-36.

We find Petitioner's arguments persuasive on the present record. Therefore, with respect to Petitioner's asserted ground of obviousness by Rose and Chandler, Petitioner has demonstrated that there is a reasonable likelihood of prevailing on its challenge to the patentability of claims 1 and 4-9.

> 3. *Asserted obviousness based on Rose, Chandler, and Ornerfors— Claims 2 and 3*

Petitioner asserts that Ornerfors discloses an electromagnetic presence sensor that indicates whether a cow is occupying the arriving stall, as recited in claims 2 and 3. Pet. 36-41. Specifically, Petitioner asserts that Ornerfors discloses using an electromagnetic sensor to locate a cow's teats to spray disinfectant thereon. Pet. 38-39. While Ornerfors does not explicitly disclose using

19

Case IPR2013-00575
Patent 6,443,094

electromagnetic sensors to detect the presence of a cow, Petitioner asserts that

using such sensor to locate a cow's teats necessarily detects the presence of a cow.

*Id.* at 40.  Lastly, Petitioner asserts that it would have been obvious to one of

ordinary skill in the art to combine Ornerfors' electromagnetic sensor with the

rotary milking apparatus of Rose and Chandler, to avoid spraying an empty stall.

*Id.* at 40-41.

 We find Petitioner's arguments persuasive on the present record.  Therefore,

with respect to Petitioner's asserted ground of obviousness by Rose, Chandler, and

Ornerfors, Petitioner has demonstrated that there is a reasonable likelihood of

prevailing on its challenge to the patentability of claims 2 and 3.

   *4. Asserted obviousness based on Rose, Chandler, and Hall—Claims
    2 and 3*

 Petitioner asserts that Hall discloses an electromagnetic presence sensor to

indicate whether a cow is occupying the arriving stall, as recited in claims 2 and 3.

Pet. 41-43.  Hall's disclosure of electromagnetic sensors is redundant to that of

Ornerfors.  We do not authorize *inter partes* review on this redundant ground.

   *5. Asserted obviousness based on Rose, Chandler, and Phillips or
    van der Lely—Claim 10*

 Claim 10 requires the cleaning section extend between a front leg and hind

leg of the cow.  Petitioner asserts that this limitation relates to the use of a spray

arm when the cows are arranged in a herringbone pattern, as depicted in Figure 7

of the '094 patent (which is included below).  Pet. 43; *see* Ex. 1001, col. 8, ll. 13-

15 ("FIG. 7 shows . . . the present invention . . . in a circular herringbone parlor.").

20

Case IPR2013-00575
Patent 6,443,094



Figure 7 depicts a milking parlor with the cows situated in a herringbone pattern.  Petitioner asserts that Phillips discloses a rotary milking platform with a herringbone stall configuration and relies on Phillips, Figure 1 (which is included below) for support.  Pet. 44.



Figure 1 depicts a rotating milking parlor which holds the cows (depicted symbolically as drumsticks) in a herringbone pattern.  Petitioner further points out that Chandler specifies that the stall may be arranged radially or in a herringbone configuration.  *Id*. at 43 (*citing* Ex. 1004, 3, ll. 61-67).  Petitioner reasons that

21

Case IPR2013-00575
Patent 6,443,094

"access to a cow's teats in a herringbone configuration of stalls, as referenced by Chandler, would necessarily if not preferably have been from the side of the cow, *i.e.*, between the front and hind legs." *Id.* at 44. In view of Phillips, Petitioner argues that it would have been obvious to one of ordinary skill in the art to position Rose's cleaning section between the cow's front and hind legs, as doing so would provide more direct access to the desired cleaning position beneath the cow's udder. *Id.* at 45.

We find Petitioner's arguments persuasive on the present record. Therefore, with respect to Petitioner's asserted ground of obviousness by Rose, Chandler, and Phillips, Petitioner has demonstrated that there is a reasonable likelihood of prevailing on its challenge to the patentability of claim 10.

Petitioner also asserts that van der Lely discloses an arrangement where the cleaning section is placed between a cow's front and hind legs. As applied to claim 10, van der Lely's disclosure is redundant to that of Phillips. We do not authorize *inter partes* review on this redundant ground.

### C. Asserted Grounds Based on Robex

Robex is redundant to Rose for the disclosure on which Petitioner relies. Pet. 45-49. All of the secondary references combined by Petitioner with Robex were also combined with Rose in the same manner. Pet. 49-52. Thus, Petitioner's remaining grounds of unpatentability, based on Robex, are redundant to those grounds discussed above. We do not need to reach the issue of whether Robex is an enabling reference. We do not authorize *inter partes* review on those redundant grounds.

22

Case IPR2013-00575
Patent 6,443,094

### III.    CONCLUSION

Petitioner has demonstrated that there is a reasonable likelihood of prevailing on its challenge to the patentability of claims 1-10 of the '094 patent.

The Board has not made a final determination on the patentability of the challenged claims.

### IV.    ORDER

For the reasons given, it is:

ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '094 patent is hereby instituted as to the following grounds of unpatentability:

1. Claims 1 and 4-9 as anticipated under § 102(b) by Rose;

2. Claims 1 and 4-9 as unpatentable under § 103(a) over Rose and Chandler;

3. Claims 2 and 3 as unpatentable under § 103(a) over Rose, Chandler, and Ornerfors; and

4. Claim 10 as unpatentable under § 103(a) over Rose, Chandler, and Phillips;

FURTHER ORDERED that the *inter partes* review shall commence on the entry date of this Order, and that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial;

FURTHER ORDERED that the trial is limited to the grounds listed in this Order—no other ground is authorized; and

FURTHER ORDERED that an initial conference call with the Board is scheduled for 2 PM Eastern Time on March 13, 2014.  The parties are directed to the Office Trial Practice Guide, 77 Fed. Reg. 48,756, 48,765-66 (Aug. 14, 2012) for guidance in preparing for the initial conference call, and should be prepared to

23

Case IPR2013-00575
Patent 6,443,094

discuss any proposed changes to the Scheduling Order entered herewith and any

motions the parties anticipate filing during the trial.

PETITIONER:

Jeffrey R. Snay
Jeff Goehring
Douglas V. Rigler
Young & Thompson
JSnay@Young-Thompson.com
JGoehring@Young-Thompson.com
DRigler@Young-Thompson.com
Phone: (703) 521-2297

PATENT OWNER:

Mark L. Lorbiecki
Michael J. Folise
Lowe Graham Jones PLLC
Lorbiecki@LoweGrahamJones.com
Folise@LoweGrahamJones.com
Phone: (206) 381-3300

# United States Court of Appeals
# for the Federal Circuit

*Lely Patent N.V. v. Delaval International AB,* 2015-1669

## CERTIFICATE OF SERVICE

I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by LOWE GRAHAM JONES PLLC, attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **July 27, 2015,** counsel has authorized me to electronically file the foregoing corrected **Brief for Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following

>Jeffrey R. Snay
>Jeffrey M. Goehring
>Douglas V. Rider
>YOUNG & THOMPSON
>209 Madison St., Ste. 500
>Alexandria, VA 22314
>703-521-2297
>jsnay@young-thompson.com
>jgoehring@young-thompson.com
>Email: drigler@young-thompson.com
>*Counsel for Appellee*

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.  The brief was originally filed and served on July 20, 2015.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in its rules.

July 27, 2015

/s/ Elissa Matias
Counsel Press

## CERTIFICATE OF COMPLIANCE

**With Type-Volume Limitation, Typeface Requirements,
And Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains 7,889 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 Times New Roman.

Dated: July 20 2015

_____
Mark L. Lorbiecki, WSBA No. 16796
LOWE GRAHAM JONES PLLC
701 Fifth Avenue, Suite 4800
Seattle, WA 98104
Telephone: 206.381.3300
Facsimile: 206.381.3301
lorbiecki@lowegrahamjones.com


Attorneys for Appellant